**TIME, INCORPORATED; Newsweek, Inc.; The Reuben H. Donnelley Corporation; Mail Advertising Service Association International; Direct Mail/Marketing Association, Inc.; Mail Order Association of America; National Association of Greeting Card Publishers; American Business Press, Inc.; Associated Third Class Mail Users; American Retail Federation; Council of Public Utility Mailers; United Parcel Service of America, Inc., Petitioners,**

v.

**UNITED STATES POSTAL SERVICE, Respondent,**

**Direct Mail/Marketing Association, Inc.; Dow Jones & Company; The National Association of Greeting Card Publishers; Association of American Publishers; The Recording Industry Association of America, Inc.; United Parcel Service of America, Inc.; American Newspaper Publishers Association; Advertisers Distribution Services; Advertisers Postal Service Corp.; Magazine Publishers Association; Classroom Publishers Association; March of Dimes Birth Defects Foundation; National Newspaper Association; Mail Order Association of America; Parcel Shippers Association; Time, Incorporated; Newsweek, Inc.; Council of Public Utility Mailers; American Retail Federation; American Bankers Association, Intervenors.**

.

**DIRECT MAIL/MARKETING ASSOCIATION, INC. and Associated Third Class Mail Users, Plaintiffs-Appellants,**

v.

**UNITED STATES POSTAL SERVICE, Defendant-Appellee.**

**Nos. 893–897, Dockets 81–4183, 81–4185, 81–4203, 81–4205 and 81–6216.**

United States Court of Appeals, Second Circuit.

Argued April 21, 1982.
Decided July 9, 1982.

John M. Burzio, Washington, D. C. (Hydeman, Mason, Burzio & Lloyd, Justin R. Wolf, Louise C. Powell, Washington, D. C., Charles M. Waygood, Olwine, Connelly, O'Donnell & Wehyer, New York City, of counsel), for petitioner-intervenor Time, Inc.

Toni K. Allen, Jay A. Resnick, Wald, Harkrader & Ross, Washington, D. C., Diana M. Daniels, New York City, of counsel, for petitioner-intervenor Newsweek, Inc.

Robert A. Saltzstein, Stephen Mark Feldman, Wyatt, Saltzstein, Lipsen, & Hamberger, Washington, D. C., of counsel, for petitioner American Business Press.

George P. Williams, III, Philadelphia, Pa. (Robert L. Kendall, Jr., John E. McKeever, Margaret S. Woodruff, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., of counsel), for petitioner-intervenor United Parcel Service.

Richard J. Webber, Washington, D. C. (Matthew S. Perlman, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., of counsel), for petitioner-intervenor Nat. Ass'n of Greeting Card Publishers.

Thomas W. McLaughlin, Washington, D. C. (John M. Burzio, Hydeman, Mason, Burzio & Lloyd, Washington, D. C., of counsel), for petitioner The Reuben H. Donnelley Corp.

Ann J. LaFrance, Washington, D. C. (J. Edward Day, Squire, Sanders & Dempsey, Washington, D. C., Peter R. Stern, Berger, Steingut, Weiner, Fox & Stern, New York City, of counsel), for petitioner Associated Third Class Mail Users.

Dana T. Ackerly, Washington, D. C. (David K. Flynn, Covington & Burling, Washington, D. C., Robert L. Sherman, Weil, Guttman & Davis, Peter R. Stern, Breger, Steingut, Weiner, Fox & Stern, New York City, of counsel), for petitioner-intervenor-appellant Direct Mail/Marketing Ass'n, Inc.

David C. Todd, Washington, D. C. (Steven M. Schneebaum, Patton, Boggs & Blow, Washington, D. C., of counsel), for petitioner-intervenor Mail Order Ass'n of America, Inc.

Eugene E. Threadgill, Washington, D. C. (Connole & O'Connell, Washington, D. C., of counsel), for petitioners American Retail Federation and Council of Public Utility Mailers.

Frances G. Beck, Associate Gen. Counsel, U. S. Postal Service, Washington, D. C.

(Louis A. Cox, Gen. Counsel, Daniel J. Foucheaux, Jr., Asst. Gen. Counsel, Richard T. Cooper, Leslie A. Corston, Eric P. Koetting, Gerald J. Robinson, U. S. Postal Service, Washington, D. C., of counsel), for respondent-appellee U. S. Postal Service.

James N. Horwood, Washington, D. C. (David R. Straus, John Michael Adragna, Spiegel & McDiarmid, Washington, D. C., William S. Seeley, Eastlund, Peterson & Solstad, Minneapolis, Minn., of counsel), for intervenors Advertisers Distribution Services and Advertisers Postal Service Corp.

William H. Smith, Gen. Counsel, Michael F. Crotty, Asst. Gen. Counsel, American Bankers Ass'n, Washington, D. C., of counsel, for intervenor American Bankers Ass'n.

Before LUMBARD, MOORE and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

This is the second matter before this Court arising from the fifth general rate-making proceeding since the enactment of the Postal Reorganization Act of 1970, 39 U.S.C. §§ 101 et seq. (Act). In *Newsweek, Inc. v. United States Postal Service*, 663 F.2d 1186 (2d Cir. 1981), *cert. granted*, —— U.S. ——, 102 S.Ct. 1969, 72 L.Ed.2d 439 (1982), we addressed the lawfulness of certain changes in postal rates and fees which took effect on March 22, 1981 under protest by the Board of Governors of the United States Postal Service (Board). Shortly before *Newsweek* was decided, the rates and fees were modified by the Board pursuant to 39 U.S.C. § 3625(d). Those modifications are the subject of this proceeding.

A variety of challenges have been raised to the Board's modifications. Several parties argue that the Board was without authority to exercise its modification powers in this instance. Others rest on much narrower grounds, contending that the Board offered inadequate explanations for its individual modifications. For purposes of this opinion, we will assume familiarity with

*Newsweek* and with the structure of the Postal Service, which is discussed therein, *id.* at 1190–91.

## BACKGROUND

The rate-making proceeding underlying this case, Docket R80–1, commenced on April 21, 1980 when the Postal Service transmitted a request to the Postal Rate Commission (PRC) for a recommended decision on changes in postal rates and fees, *see* 39 U.S.C. § 3622(a). J.App., Vol. 3 at 1064–68. The request was accompanied by a schedule of rates and fees proposed by the Postal Service supported by testimony of eleven witnesses and thousands of documents. As set forth in greater detail in *Newsweek*, 663 F.2d at 1191–92, the PRC conducted extensive hearings pursuant to 39 U.S.C. § 3624 and issued a recommended decision on February 19, 1981. Opinion and Recommended Decision of the Postal Rate Commission (Feb. 19, 1981), J.App., Vol. 5 (*First Recommended Decision*). The Board, however, was dissatisfied with the recommended decision primarily because it considered the proposed rates insufficient to meet the Postal Service's anticipated revenue requirements.[1] Accordingly, for the first time since the Act's enactment in 1970, the Board elected not to accept a rate decision recommended by the PRC. Instead, the Board allowed the recommended rates to take effect under protest and returned the decision to the PRC for reconsideration and a further decision pursuant to 39 U.S.C. § 3625(c). Decision of the Governors of the United States Postal Service on Rates of Postage and Fees for Postal Services (Mar. 10, 1981), J.App., Vol. 1 at 205–323. The Board's order allowing the rates to take effect under protest constituted a decision reviewable by "any court of appeals of the United States," 39 U.S.C. § 3628, and this

Court was ultimately asked to scrutinize the new rates in *Newsweek*.

Meanwhile, the PRC reconsidered its decision and issued a second recommended decision. Opinion and Recommended Decision Upon Reconsideration (June 4, 1981), J.App., Vol. 7 (*Second Recommended Decision*). The PRC substantially reaffirmed its first recommendation, asserting that the Board had exaggerated the Postal Service's revenue needs. On June 29, the Board rejected the PRC's *Second Recommended Decision* in its entirety, but left intact the rates which had taken effect under protest on March 22. Decision of the Governors of the United States Postal Service on the Postal Rate Commission's June 4, 1981 Recommended Decision Upon Reconsideration (June 29, 1981), J.App., Vol. 1 at 324–39. The Board returned the matter to the PRC for reconsideration and a third recommended decision, which was issued on September 17, 1981. Opinion and Recommended Decision Upon Further Reconsideration (Sept. 17, 1981), J.App., Vol. 8 (*Third Recommended Decision*). The September 17 recommendation was identical to the *Second Recommended Decision*, as the PRC steadfastly clung to its position that the Board had overstated the Service's revenue needs.

On September 29, 1981, the Board issued the order challenged in this proceeding. Decision of the Governors of the United States Postal Service on Rates of Postage and Fees for Postal Services (Sept. 29, 1981), J.App., Vol. 1 at 340–416 (*Modification Decision*). The Board, pursuant to its modification powers, *see* 39 U.S.C. § 3625(d), drastically revised the PRC's *Third Recommended Decision*, in many particulars by simply installing those rates originally proposed by the Postal Service in

---

1. The PRC slashed roughly $1 billion from the revenue requirements included in the Postal Service's requested rates. The PRC achieved its revenue reductions in large part by eliminating the $449 million provision for recovery of prior years' losses, and by reducing the "reasonable provision for contingencies" by $263 million and the Civil Service Retirement Fund by $123 million. Further, by adopting a new

productivity measurement technique, the PRC was able to cut an additional $143 million from revenue needs. *See Newsweek*, 663 F.2d at 1203–06.

The Board also took issue with the PRC for employing the Service-Related Cost (SRC) concept in assigning over $1.8 billion of unattributable postal costs to certain preferred categories of mail. *Id.* at 1201–03.

commencing the rate proceeding. The Board issued a twenty-seven page statement of justification for the modifications, prefacing its remarks by reiterating the fundamental problem it found in each PRC decision:

The rates recommended to us as Governors by the Postal Rate Commission, in its September 17, 1981 Recommended Decision Upon Further Consideration, are patently inadequate. The rates recommended by the Commission, on the basis of the record before the Commission and the Governors, will not provide the Postal Service with sufficient revenues to meet its costs.

*Modification Decision* at 1, J.App., Vol. 1 at 340. The Board, however, chose not to "address the [PRC's] positions point by point, but instead present[ed] the reasons for [its] modification actions." *Id.* at 6, J.App., Vol. 1 at 345. The Board did "incorporate by reference" its prior decisions of March 10 and June 29 as rationale for the new rates. *Id.*

The Board's explanation for the class by class modifications was limited to a seven-page conclusory discussion. While the Board stated that the new rates were "reasonable, equitable, and fiscally responsible" and "based on extensive record evidence," *id.* at 18, J.App., Vol. 1 at 357, the Board cited no evidence in the record. The Board asserted that it had "consider[ed] all of the rate schedules in order to develop rates that are rationally interrelated and harmonious," *id.*, but offered no explanation of why and how the modified rates achieve this goal. And unlike the PRC, which had issued hundreds of pages of detailed explanations discussing the arguments for and against each recommended rate, the Board gave little indication that it had even considered much of the record evidence, often stating that the rates adopted for various classes were simply "those which the Postal Service proposed in its initial Request." *Id.* at 19, 21, 22, 23, J.App., Vol. 1 at 358, 360, 361, 362.

On October 29, 1981, two days before the modified rates were to take effect, two complaints were filed in district courts seeking injunctions to prevent the modified third class bulk rates from taking effect. Both complaints were dismissed for lack of jurisdiction. *United Parcel Service, Inc. v. United States Postal Service*, 524 F.Supp. 1235 (D.Del.1981); *Direct Mail/Marketing Association v. United States Postal Service*, 524 F.Supp. 1219 (S.D.N.Y.1981). The appeal from the latter case has been consolidated for our review.

On November 1, the modified rates took effect. A day later, *Newsweek*, which in large part upheld the legality of the rates which had taken effect under protest on March 22, 1981, was decided. Our discussion of several issues in *Newsweek* bears heavily on this proceeding and merits brief repetition. First, we rejected several decisions of the United States Court of Appeals for the District of Columbia Circuit which *required* the PRC to employ cost-of-service principles to the maximum extent possible in devising the postal rates.[2] *See National Association of Greeting Card Publishers v. United States Postal Service*, 607 F.2d 392 (D.C.Cir.1979), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980) (*NAGCP III*); *National Association of Greeting Card Publishers v. United States Postal Service*, 569 F.2d 570 (D.C.Cir.1976), *vacated as to other issues*, 434 U.S. 884, 98 S.Ct. 253, 54 L.Ed.2d 169 (1977) (*NAGCP I*). We declined, however, to hold the cost allocation methodology mandated by *NAGCP I* and *III* unlawful and stated that it could be used at the PRC's option. 663 F.2d at 1201. In addition, we reviewed the nearly $1 billion in Postal Service revenues slashed by the PRC in formulating rates. *See* note 1, *supra*. These revenue reductions were in large part the cause for the Board's ultimate decision to modify the rates. We held in *Newsweek* that the PRC's reduction of the Service's revenue requirements was an unlawful encroachment upon the policy-

---

**2.** The Supreme Court recently granted *certiorari* to resolve this conflict. —— U.S. ——, 102 S.Ct. 1969, 72 L.Ed.2d 439 (U.S. Apr. 20, 1982).

making domain of the Board and ordered the PRC to "refrain from making arbitrary adjustment of the Postal Service's [revenue] estimates." *Id.* at 1205. Significantly, because *Newsweek* was filed after the Board exercised its modification powers, the PRC was never given the opportunity to comply with our mandate that it accede to the Service's revenue needs as anticipated by the Board.

Finally, we addressed the Board's implementation of temporary third class bulk rates under 39 U.S.C. § 3641. We held that the PRC's *First Recommended Decision* had included a third class bulk rate which was "legally and practically speaking, impossible to implement." *Id.* at 1207. Accordingly, we found that the Board had acted properly by treating the PRC's proposed rates as a legal nullity and implementing temporary rates pursuant to section 3641(a). *Id.* at 1206–07. Notably, the Board's modified rates, which took effect on November 1, included permanent third class bulk rates. *Modification Decision*, Schedules D–2, D–3, J.App., Vol. 1 at 379–80.

## DISCUSSION

### I. 39 U.S.C. § 3625(d)

The initial issue for resolution is whether the Board was empowered to modify the PRC's *Third Recommended Decision.* The United Parcel Service (UPS), joined by the American Bankers Association (ABA), vehemently argues that once the Board allowed the PRC's *First Recommended Decision* to take effect under protest, it forever abandoned its authority to modify a later recommended decision in the course of this rate proceeding. To resolve this issue, we must construe 39 U.S.C. § 3625, which we set forth in pertinent part below:

(a) Upon receiving a recommended decision from the Postal Rate Commission, the [Board] may approve, allow under protest, reject, or modify that decision in accordance with the provisions of this section.

(b) The [Board] may approve the recommended decision and order the decision placed in effect.

(c) The [Board] may, under protest, allow a recommended decision of the [PRC] to take effect and (1) seek judicial review thereof under section 3628 of this title, or (2) return the recommended decision to the [PRC] for reconsideration and a further recommended decision, which shall be acted upon under this section and subject to review in accordance with section 3628 of this title.

(d) The [Board] may reject the recommended decision of the [PRC] and the Postal Service may resubmit its request to the [PRC] for reconsideration. Upon resubmission, the request shall be reconsidered, and a further recommended decision of the [PRC] shall be acted upon under this section and subject to review in accordance with section [3628] of this title. However, with the unanimous written concurrence of all of the Governors then holding office, the [Board] may modify any such further recommended decision of the [PRC] under this subsection if the [Board] expressly find[s] that (1) such modification is in accord with the record and the policies of this chapter, and (2) the rates recommended by the [PRC] are not adequate to provide total revenues so that total estimated income and appropriations will equal as nearly as practicable estimated total costs.

(footnote omitted).

UPS submits that "once the [Board] elected to accept the [PRC's] rates by ordering them to take effect under § 3625(c), the [Board] at that same time elected to give up [its] option to 'reject' those rates under § 3625(d)." Brief for Petitioner UPS at 15. Under UPS' position, the Board would have to reject the *initial* PRC recommended decision and thereby forego the additional revenues it would generate in order to employ the modification power at a later time. We reject this position.

■ We begin our analysis with the language of section 3625(c). *See Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). That section,

in authorizing the Board to allow a recommended decision to take effect under protest, does not limit the Board's options with respect to a requested further recommended decision. Quite the contrary, section 3625(c) states that "a further recommended decision ... *shall be acted upon under this section* and subject to review in accordance with section 3628 of this title." (emphasis added). This language indicates that a further recommended decision is to be treated by the Board exactly like an initial decision, with the full panoply of options set forth in section 3625(a)—including rejection and subsequent modification under section 3625(d).[3]

What sparse legislative history exists on section 3625(d) confirms that Congress did not intend to remove the Board's rejection and modification options once it allowed a decision to take effect under protest. The Senate Report states explicitly:

> [The Board] may, in the exercise of [its] discretion, implement a recommended decision of the [PRC] under protest. In such event, the decision would take effect in the manner proposed by the [PRC], and at a time fixed by the [Board], but the [Board] could either seek judicial review of the [PRC's] action or ask the [PRC] to reconsider and make a further recommended decision. *Any such further recommended decision would be acted upon by the [Board] subject to the same right of review as exists with respect to action on recommended decisions rendered in response to an original request of the [Board] and may be appealed by aggrieved parties to the courts.*

S.Rep.No. 91–912, 91st Cong., 2d Sess. 17 (1970) (emphasis added). Accordingly, we see no legislative barrier to the Board's rejection of a further recommended decision and subsequent modification. The statute provides only that the Board is to treat a PRC recommended decision—whether it be the first or the fiftieth—as if it were an "original" decision. To the extent that the Board rejects *any* recommended decision, it is empowered to modify the ensuing recommended decision provided that section 3625(d)'s other requirements are satisfied.

UPS suggests that its reading of the section would advance the congressional intent that the Board's modification powers be used sparingly and only in "limited circumstances." *Id.* at 13. UPS notes that the Board would be deterred from using its modification powers if as a precondition it were forced to reject the PRC's initial recommended decision and thereby forego added revenues. We find this position in direct conflict with the purposes and policies of the Postal Reorganization Act.

In revising the structure of the Postal Service, Congress intended to create an independent agency "with the unfettered authority and freedom it [had] been denied for years." S.Rep.No. 912, 91st Cong., 2d Sess. 2 (1970). To ensure that the Service would be self-sustaining, Congress, in addition to granting wide-ranging powers in 39 U.S.C. § 401, stated "Postal rates and fees shall provide sufficient revenues so that the total estimated income and appropriations to the Postal Service will equal as nearly as practicable total estimated costs of the Postal Service," 39 U.S.C. § 3621. The entire structure of the rate-making provisions of

---

**3.** UPS argues further that the concluding references to section 3628 in subsections 3625(c) & (d) are intended to limit the Board's available responses to further recommended decisions of the PRC to those directly reviewable in the circuit courts—*i.e.*, acceptance, allowance under protest, or modification. Accordingly, UPS asserts that rejection is available to the Board only in response to an *initial* PRC recommended decision.

We read the concluding references to section 3628 simply to mean that review will be available if the action taken by the Board falls within the scope of section 3628. Our reading is but-

tressed by the Senate Report accompanying the Act, which states that the Board may act upon a further recommended decision of the PRC "in the same manner as if it were an initial recommended decision, and *judicial review will be available to the same extent as if the recommendation was being acted upon for the first time.*" S.Rep.No.91–912, 91st Cong. 2d Sess. 16 (1970) (emphasis supplied). Accordingly, while the Board may reject a further recommended decision, review may not occur under section 3628 until the Board accepts, allows under protest or modifies a still further recommended decision.

the Act was designed to reinforce this vision that the Service maintain a balanced budget at all times. For example, section 3641 allows the Board to establish temporary rates where the PRC fails to submit a recommended rate for a given class of mail. Further, section 3681 provides:

No mailer may be reimbursed for any amount paid under any rate or fee which, after such payment, is determined to have been unlawful after proceedings in accordance with the provisions of section 3628 of this title, or is superseded by a lower rate or fee established under subchapter II of this chapter.

Congress clearly made every attempt possible to ensure that the Service's cash flow would not be disrupted to ensure the "prompt, reliable, and efficient services to patrons," 39 U.S.C. § 101. Against this carefully designed statutory framework, UPS urges us to read section 3625 to require the Board to forego the additional revenues which would be generated by allowing a PRC recommended decision to take effect under protest in order to preserve its option to modify a further recommended decision. We decline this invitation. We believe that the very purpose of this "allowance under protest" option was to enable the Service to realize additional revenues pending the Board's resolution of its differences with the PRC. To the extent that those differences cannot be resolved through negotiation and compromise, however, Congress provided the Board with limited modification powers to ensure that final rates could be established. We conclude that the Board acted within the powers granted in section 3625 in modifying the PRC's *Third Recommended Decision* except as we state below.[4]

UPS also argues that even if the Board was empowered to reject the PRC's *Second Recommended Decision*, a proper rejection would have restored the rates extant prior to the commencement of this rate-making proceeding.[5] UPS submits that by leaving intact the rates which took effect under protest and at the same time rejecting the PRC's *Second Recommended Decision*, which recommended almost identical rates, the Board reached the anomalous result of accepting and rejecting the same rates. The Postal Service responds that "UPS is able to make its argument only because of the circumstance that, in the instant case, the Commission's Second Recommended Decision was almost identical to its First Recommended Decision." Brief for Respondent United States Postal Service at 18.

▮ We believe that UPS has misperceived the status of rates which take effect under protest. Although the rate-making process continues, rates adopted under protest are nevertheless permanent and capable of being judicially reviewed. *See* 39 U.S.C. § 3628. Such rates can be replaced only through a further recommended decision by the PRC and subsequent approval by the Board. To the extent that the Board rejects a further recommended decision, this has no bearing on rates previously allowed to take effect under protest.

## II. THIRD CLASS BULK RATES

In its *Modification Decision*, the Board provided for permanent third class bulk mail rates. Several third class mailers now charge that the Board lacked power to modify rates for that subclass.[6] We agree but

---

4. We also reject the American Bankers Association's position that the Board's action, because it was of such "massive proportions," did not constitute a "modification." Brief for Intervenor American ·Bankers Ass'n; *see also* Supplemental Brief of Petitioners Associated Third Class Mail Users and Intervenor Direct Mail/Marketing Ass'n, Inc. at 12–13. The extent of the Board's modifications merely reflects the Board's disagreement with the PRC as to the Service's revenue requirements, a

matter we held in *Newsweek* to be within the Board's province, 663 F.2d at 1205.

5. UPS is joined in this argument by the American Bankers Association and the National Association of Greeting Card Publishers.

6. The parties challenging the third class bulk rates are: Petitioners Associated Third Class Mail Users, Mail Order Ass'n of Am. and Intervenor Direct Mail/Marketing Ass'n, Inc. We refer to these parties as the "third class mailers" for convenience.

find that the rates as "modified" may be retained by the Board as temporary rates under section 3641.[7]

An understanding of this controversy must begin with the PRC's *First Recommended Decision.* As we described in *Newsweek,* that decision included third class bulk rates "which were, legally and practically speaking, impossible to implement" because they failed to conform to "the existing classification schedule." 663 F.2d at 1206–07. "In effect, the PRC's rates were contingent upon a change in classification which had neither been discussed nor proposed in any record proceeding." *Id.* at 1206. Accordingly, we held that the Board was entitled to disregard the recommended third class bulk rates, and implement temporary rates pursuant to its powers under 39 U.S.C. § 3641(a), which provides:

> In any case in which the Postal Rate Commission fails to transmit a recommended decision on a change in rates of postage or in fees for postal services to the [Board] in accordance with section 3624(c) of this title, the Postal Service may establish temporary changes in rates of postage and in fees for postal services in accordance with the proposed changes under consideration by the [PRC]. Such temporary changes may take effect upon such date as the Postal Service may determine, except that such temporary changes may take effect only after 10 days' notice in the Federal Register.

We stressed in *Newsweek* that the PRC's failure to recommend third class bulk rates capable of being implemented produced the same "net effect" as "a failure by the PRC to transmit a recommended decision within the meaning of section 3641," *id.* at 1207 n.16.

Despite the Board's declaration that the recommended third class bulk mail rates were impossible to implement, the PRC's *Second Recommended Decision* proposed identical rates.[8] The PRC stated simply: "Upon reconsideration we are constrained to reaffirm our recommended rate structure . . . ." *Second Recommended Decision* at 156, J.App., Vol. 7 at 156. The Board purportedly "rejected" those rates along with the PRC's other proposals in its June 29, 1981 decision.[9] Decision of the Governors of the United States Postal Service on the Postal Rate Commission's June 4, 1981 Recommended Decision Upon Reconsideration 13–15, J.App., Vol. 1 at 336–38. The PRC's *Third Recommended Decision* reaffirmed those rates once again. *Third Recommended Decision* at 60, J.App., Vol. 8 at 60. Subsequently, in its *Modification Decision,* the Board implemented revised permanent third class bulk rates. *Modification Decision* at 19–20, J.App., Vol. 1 at 358–59.

■ The third class mailers argue that the Board lacked authority to establish permanent third class bulk mail rates under section 3625(d) because the PRC had never recommended rates capable of being rejected or modified. The Postal Service responds that while the PRC's recommended third class bulk rates were incapable of implementation, they "were capable of being rejected and were definitely rejected." Brief for Respondent United States Postal Service at 25. We hold that the PRC's failure to transmit a proper recommended third class bulk rate precluded the Board from exercising its modification option as to that rate.

At the outset, we reiterate the reason that the PRC's initial recommended third class bulk mail rates were held to be legally defective in *Newsweek*—the recommended rates failed to conform to the existing classification schedule. Thus, for the same reason that the recommended rates could not

---

7. In light of our holding that the Board lacked authority to implement permanent third class bulk rates, we do not address several claims that those rates are unlawful because they are unsupported by substantial evidence in the record.

8. We recognize that the PRC at that point did not have the guidance provided in *Newsweek* and that it was therefore simply adhering to a position it believed was legally proper.

9. The Board left the temporary rates implemented on March 22, 1981 in effect.

be implemented under the existing classification schedule, they could not be modified to comport with that schedule.[10] Moreover, we construe sections 3625 and 3641 to be mutually exclusive—only one can apply to a recommended rate. Where the PRC recommends a proper rate under the Act,[11] the Board's options are set forth in section 3625. In the absence of a proper recommended rate, however, the Board is empowered to act only on a temporary basis as set forth in section 3641. For the reasons set forth in *Newsweek*, 663 F.2d at 1206–07, the third class bulk rates proposed in each of the PRC's recommended decisions fell within the latter category. Accordingly, the Board simply lacked the authority to exercise its options under section 3625 with respect to these rates.

 Although the Board lacked authority to modify the PRC's recommended third class bulk rates and to establish permanent rates for that class, the Board was clearly empowered to implement temporary rates pursuant to section 3641. *Newsweek*, 663 F.2d at 1206–07. Indeed, the authority to establish temporary rates may be exercised whenever the PRC "fails to transmit a recommended decision." Thus, the Board is free to establish or adjust temporary rates where appropriate after each recommended decision within the same rate-making proceeding. The limitations on temporary rates are set forth in section 3641(b)–(d):

(b) Any temporary rate or fee established by the Postal Service under subsection (a) of this section shall be in accordance with the policies of this title and shall not exceed such amount as may be necessary for sufficient revenues to assure that the total estimated income, including appropriations, of the Postal Service shall, to the extent practicable, be equal to the total estimated costs of the Postal Service.

(c) Notwithstanding the provisions of subsection (b) of this section, the Postal Service may not establish any temporary rate for a class of mail or any temporary fee for a postal service which is more than the permanent rate or fee requested for such class or postal service by the Postal Service under section 3622 of this title.

(d) Any temporary change in rates of postage or in fees for postal services made by the Postal Service under this section shall remain in effect no longer than 150 days after the date on which the [PRC] transmits its recommended decision to the [Board] under section 3624(d) of this title, unless such temporary change is terminated by the [Board] before the expiration of such period.

Under these guidelines, the third class bulk mail rates adopted by the Board in its *Modification Decision* would clearly be permissible as temporary rates. Accordingly, the Board may retain these rates should it wish as temporary rates under section 3641. Should the Board fail to implement such rates on a temporary basis before the mandate in this proceeding issues, the third class bulk rates will revert to those temporary rates extant prior to November 1, 1981.

Our disposition of this issue on the merits renders moot the appeal of Direct Mail/Marketing Association concerning the jurisdiction of the district court to enjoin the third class bulk rates. Accordingly, that appeal is dismissed.

## III. THE MODIFICATIONS

The vast majority of petitioners and intervenors in this proceeding assert that the Board failed to provide adequate justifica-

---

10. Had the recommended decision in this proceeding related to mail classifications as opposed to rates, *see* 39 U.S.C. § 3623, the Board would undoubtedly have been empowered to modify the recommended classification schedule in accordance with 39 U.S.C. § 3625(d).

11. As we indicated in *Newsweek*, our use of the term "proper rate" connotes a rate legally capable of being implemented. The PRC can thus invite the Board's implementation of temporary rates either by failing to recommend any rate at all, or by recommending a rate which simply cannot be legally implemented.

tion for particular modifications.[12] In addition, several parties argue that specific modifications are unsupported by substantial evidence.[13] The extent and nature of explanations necessary to support the Board's exercise of its section 3625(d) modification powers are far from clear. As we noted earlier, this is the first rate-making proceeding under the Postal Reorganization Act of 1970 in which the Board has not accepted the initial recommended decision of the PRC. Accordingly, the issue of modification has not arisen previously.

In ordering modified rates into effect, the Board discussed the inadequacy of projected revenues under the PRC's recommendations. The Board, however, failed to provide explanations for the specific class by class modifications it effected. Several parties therefore contend that the Board failed to provide the reasoned explanation ordinarily required of administrative agencies to support their actions. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943).

The Board's duty to provide explanations for its modifications finds its roots in two sources. First, section 3625(d) states that as a prerequisite to modification, the Board must find

(1) such modification is in accord with the record and the policies of this chapter, and (2) the rates recommended by the [PRC] are not adequate to provide sufficient total revenues so that total estimated income and appropriations will equal as nearly as practicable estimated total costs.

Section 3625(e) then requires that "[t]he decision of the [Board] to approve, allow under protest, reject, or modify a recommended decision of the [PRC] shall be in writing and shall include an estimate of anticipated revenue and a statement of explanation and justification." Second, section 3628 provides that courts of appeals "shall review [decisions of the Board] in accordance with section 706 of title 5, and chapter 158 and section 2112 of title 28." [14]

The Postal Service interprets these sections to require only what was provided by the Board—a generalized statement of the revenue deficiencies in the PRC recom-

---

**12.** These parties are: Petitioners American Retail Fed'n, Council of Pub. Util. Mailers, Mail Order Ass'n of Am., United Parcel Serv. of Am., Inc., National Ass'n of Greeting Card Publishers, Time, Inc., Newsweek, Inc., American Business Press, The Reuben H. Donnelley Corp., Direct Mail/Marketing Ass'n, Inc., and Associated Third Class Mail Users.

**13.** The parties claiming particular rates are unsupported by substantial evidence are: Petitioner Associated Third Class Mail Users and Intervenor Direct Mail/Marketing Ass'n, Inc. (Bulk Third-Class Regular Rate); Petitioners The Reuben H. Donnelley Corp., Direct Mail/Marketing Ass'n, Inc., Mail Order Ass'n of Am., Inc., and Associated Third Class Mail Users (Third Class Carrier Route Presort Discount); National Ass'n of Greeting Card Publishers (First-Class Mail).

**14.** Section 706 of title 5 U.S.C., which provides the scope of review under the Administrative Procedures Act, states:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error. Chapter 158 and section 2112 of title 28 U.S.C. relate to procedural aspects of appealing a decision of an agency.

mended decisions. Accordingly, the Service states,

> Having thus persuasively explained why the [PRC's] entire rate package was fatally defective on revenue grounds, the [Board] had no further need to repeat why it was necessary to depart from the [PRC's] recommendation in the instance of each individual component of that recommendation that was modified in accord with record evidence.

Brief for Respondent United States Postal Service at 31 n.2. The Service argues that the Board is quite distinct from other administrative agencies because it is free from most of the strictures of the Administrative Procedures Act [15] and is designed to function as an independent agency removed from the political arena, *see* S.Rep.No. 912, 91st Cong., 2d Sess. 8 (1970).

We recognize that an agency's interpretation of its enabling statute is entitled to great deference. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Nevertheless, we consider the Service's interpretation of the type and degree of explanations necessary to support the Board's exercise of its modification power overly simplistic and inconsistent with the rate-making structure of the Act. It is abundantly clear from the legislative history of the Act "that ratemaking . . . authority [was to be] vested primarily in [the] Postal Rate Commission." S.Rep.No. 912, 91st Cong., 2d Sess. 4 (1970). *See United Parcel Service, Inc. v. USPS,* 604 F.2d 1370, 1373–74 (3d Cir. 1979), *cert. denied,* 446 U.S. 957, 100 S.Ct. 2929, 64 L.Ed.2d 815 (1980). Congress intended, moreover, to create in the PRC a body capable of dealing with the "highly intricate problems of ratemaking," H.R.Rep.No. 91–1104, 91st Cong., 2d Sess. 5 (1970), *reprinted in* [1970] U.S.Code Cong. & Ad.News 3649 at 3654, an area that demanded "the fulltime skills of professional economists, trained rate analysts, and the like," *id. see* 116 Cong.Rec. 27604, 27605 (Aug. 6, 1970) (comments of Rep. Udall).

The PRC's predominant role within the rate-making scheme is borne out in the detailed procedural provisions of the Act. The PRC is charged with soliciting testimony and conducting hearings to ensure that the recommended rates are responsive not only to the Postal Service's views, but also to those of "users of the mails," 39 U.S.C. § 3624(a). Once adequate testimony and evidence has been presented, the PRC must formulate rates taking into consideration nine specific factors set forth in 39 U.S.C. § 3622(b). Finally, the Board's power to modify a PRC recommendation is limited to the specific circumstance in which "the rates recommended by the [PRC] are not adequate to provide sufficient total revenues so that total estimated income and appropriations will equal as nearly as practicable estimated total costs." 39 U.S.C. § 3625(d)(2).[16]

■ In this context, we do not believe that the limited and general statement which accompanied the Board's modifications was sufficient. The PRC's recommended rates, reflecting weeks of hearings, were carefully designed to respond to the factors set forth in section 3622(b)[17] and presumably represented a specific interrela-

---

**15.** The Service points to 39 U.S.C. § 410(a) which in large part exempts it from the provisions of the Administrative Procedures Act:

> (a) Except as provided by subsection (b) of this section, and except as otherwise provided in this title or insofar as such laws remain in force as rules or regulations of the Postal Service, no Federal law dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds, including the provisions of chapters 5 and 7 of title 5, shall apply to the exercise of the powers of the Postal Service.

The Service fails to observe, however, that section 3628 expressly provides that courts of ap-

peals "shall review the [Board's] decision, in accordance with section 706 of title 5."

**16.** Accordingly, as long as the PRC's recommended rates satisfy the Postal Service's revenue needs as anticipated by the Board, the Board is powerless to exercise its modification powers.

**17.** The PRC's *First Recommended Decision* contained 364 pages addressed to justifying the rates adopted for each class and subclass. In *Newsweek* we found the PRC's explanations sufficient to support each of the challenged rates. 663 F.2d at 1207–11.

tionship among the various classes and sub-classes of mail. While the Board found that the PRC's end product would generate insufficient revenues, the Board has failed to explain the basis for the particular class by class modifications and the rationale for the new interrelationship created.[18] Given the PRC's expertise in the area of rate-making and the limited basis for modification by the Board, we think such explanations were required.[19]

A second reason, and one more significant to our review, mandates that the Board provide class by class explanations for its modifications. Under 39 U.S.C. § 3628, we must assess the lawfulness of the modified rates in accordance with the standards set forth in 5 U.S.C. § 706, see note 14, supra. Among the determinations required under section 706 are whether the Board's modifications are supported by substantial evidence in the record and whether they are arbitrary or capricious or otherwise unlawful. We fail to see how this task may be achieved in the absence of an explanation from the Board for each modification.

The Postal Service offers several additional arguments why the class by class justifications we request are unnecessary. First, the Service points to *National Easter Seal Society for Crippled Children and Adults v. United States Postal Service*, 656 F.2d 754 (D.C.Cir.1981) (*NESS*), in which the District of Columbia Circuit stated in the context of the Board's modification of a recommended mail classification:

> Petitioners object that the [Board's] opinion contains no charts or data and does not specify exactly what volumes, costs, and revenues the [Board] foresee[s] resulting from the PRC proposal and from the settlement agreement implemented by the [Board]. We do not think that Congress intended to require that level of evidence to justify modification of a PRC recommendation. As Congressman Udall explained:
>
> > This finding does not require the [Board] to prove that the recommendation produces insufficient revenue— something which would be impossible for them to do before the rates have actually been placed into effect for a period of time. Instead it requires a reasonable finding, supportable and an appropriate exercise of discretion by the [Board], that the recommendation is likely not to produce the required revenue.
>
> 116 Cong.Rec. 27,606 (1970) (remarks of Rep. Udall, member of the House Post Office and Civil Service Committee).

*Id.* at 765. The Board's conclusion that the PRC's recommended rates will not produce adequate revenues, however, is not at issue here. Rather, the issue is whether, given the Board's reasonable estimate of the Postal Service's revenue needs, the modifica-

---

**18.** Several parties submit that the Board has no authority in modifying a PRC recommended decision to upset the interrelationship among rates created by the PRC. The National Association of Greeting Card Publishers (NAGCP), for example, suggests that if the Board's concern is with the rates' sufficiency to produce desired revenues, the Board's modification power should be exercised only on an across-the-board basis. NAGCP asserts that a five percent increase in each of the PRC's proposed rates would produce the revenue levels the Board seeks without destroying the interrelationship among the rates. *But see* Joint Brief of Intervenors Time, Inc. and Newsweek, Inc.

We find NAGCP's position untenable. The across-the-board increase endorsed by NAGCP presupposes that the PRC would maintain the same interrelationship among rates at any level, a fallacious assumption because elasticities for each class and subclass are likely to vary as rates increase or decrease. Additionally, it ignores the PRC's practice in some cases of rounding off to avoid fractional rates. Nevertheless, we find NAGCP's argument persuasive that the Board must explain why the specific departures from the PRC's recommendation were taken.

**19.** We also observe that the Board, unlike the PRC, is not required to hold public hearings. And, as the Postal Service attested at oral argument, the Board attempts to limit its exposure to lobbyists. In the absence of an explanation for each of the Board's modifications, we have no indication that the Board considered the entire record. We believe such a situation frustrates Congress' intent that the rates be responsive to the "users of the mails." 39 U.S.C. § 3624(a).

tions intended to produce those revenues are lawful and supported in the record.

The Service also points to the principle that courts must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974); *Hooker Chemicals & Plastics Corp. v. Train,* 537 F.2d 620, 632 (2d Cir. 1976). The Service urges us to review the Board's three decisions to discern a path which justifies the modifications. However, as the Service itself recognizes, Brief for Respondent United States Postal Service at 31 n.2, the Board's decisions are addressed solely to the inadequacy of the PRC recommended rates and not to the reasons for choosing particular modifications.[20] While the Service's brief presents detailed explanations for each of the challenged rates, it is clear that "[t]he courts may not accept appellate counsel's *post hoc* rationalizations for agency action." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962).

■ The Service also speculates that the Board must have adopted the reasoning and evidence advanced by the Service to support the rates it initially proposed in commencing the rate-making proceeding, which are in many respects identical to the modified rates. However, as the Supreme Court stated in *SEC v. Chenery Corp.,* 318 U.S. at 94, 63 S.Ct. at 462.

The [Securities and Exchange] Commission's action cannot be upheld merely because findings might have been made and considerations disclosed which would justify its order as an appropriate safeguard for the interests protected by the [Holding Company] Act. There must be such a responsible finding.

An agency action simply cannot be upheld where a court is "left to guess as to the agency's findings or reasons." *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 851 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). We also observe that the Postal Service's proposals to the PRC came prior to the weeks of hearings conducted pursuant to 39 U.S.C. § 3624. At a minimum, we think it necessary for the Board to evince that it has considered the record as a whole[21] as well as the factors set forth in 39 U.S.C. § 3622(b) in selecting its individual modifications.

■ While the Board's modifications may well be lawful and supported in the record, we simply cannot make those determinations at this juncture.[22] Accordingly, we remand this proceeding to the Board for further justifications subject to our discussion in Section V of this opinion. Additionally, we retain jurisdiction of this matter. The rates as modified will remain in effect in the interim.[23]

## IV. SERVICE–RELATED COSTS

In the course of its *Modification Decision,* the Board explicitly rejected the concept of Service-Related Costs (SRC), which the PRC had employed in formulating each of

---

**20.** As the D.C. Circuit stated in *Braniff Airways, Inc. v. CAB,* 306 F.2d 739, 742 (D.C.Cir. 1962).

We are asked to accept this judgment of the [CAB], but the basis on which it was reached consists of the conclusionary statements set forth above. These are not the sort of findings which enable us intelligently to pass upon the correctness of the judgment reached.

(footnote omitted).

**21.** It is a well settled principle that "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed.

456 (1951); *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 284 n.2, 95 S.Ct. 438, 441 n.2, 42 L.Ed.2d 447 (1974).

**22.** Consequently, we do not pass at this time on the claims of those parties challenging the record support for and rationality of various rates.

**23.** 39 U.S.C. § 3628 provides that "[t]he court may not suspend the effectiveness of the changes, or otherwise prevent them from taking effect until final disposition of the suit by the court." Accordingly, because we are remanding and retaining jurisdiction, we lack authority to suspend the Board's modifications.

its recommended decisions. *See Modification Decision* at 16–18, J. App., Vol. 1 at 355–57. Several parties now contend that the Board encroached upon the rate-making authority of the PRC in doing so. Their theory, in short, is that the selection of costing methodologies is within the PRC's discretion, and that the Board is bound by that selection in modifying a recommended decision.

As we discussed in *Newsweek*, 663 F.2d at 1194–96, 1201–03, the SRC concept was devised in specific response to the D.C. Circuit's mandate that postal rates reflect cost-of-service principles to the maximum extent possible. While we concluded in *Newsweek* that the concept was not irrational and could therefore be used in formulating rates, we also held, consistent with our reading of 39 U.S.C. § 3622(b), that the concept was by no means mandatory in application. *Id.* at 1201–03.

While we had no occasion in *Newsweek* to address the issue now before us—whether the Board is bound by the PRC's selection of costing methodologies in modifying a PRC recommended decision—we did imply during the course of our discussion that the choice of methodologies is normally within the province of the PRC. Thus, in holding that the maximal use of cost-of-service principles was permissible though by no means mandatory, we stated, "*the PRC may still adhere to the methodology it has employed in R80–1, and under our interpretation of the statute it is free to do so.*" *Id.* at 1201 (emphasis added). The legislative history of the Act reinforces this view that the choice of costing methodologies is a matter entrusted to the expertise of the PRC. The PRC, as we stated in Section III, *supra*, is comprised of full-time economists and rate analysts whose function is to deal with the "highly intricate problems of rate-making," H.R.Rep.No.91–1104, 91st Cong., 2d Sess. 5 (1970), *reprinted in* [1970] U.S. Code Cong. & Ad.News 3649 at 3654. We think it unquestionable that in creating a body especially tailored to devise postal rates, Congress intended for that body to exercise its expertise in selecting appropriate methodologies. This does not answer the question, however, of whether the Board is bound by those selections.

We observe at the outset that the Postal Reorganization Act is silent on the authority of the Board to reject methodologies chosen by the PRC. Thus, the Board's power to review methodologies, if it does exist, must evolve from its general authority to scrutinize recommended rate decisions under section 3625. As we have repeatedly stated, the Board's primary responsibility under that section is to assure that the Postal Service operates on a balanced budget in a "prompt, reliable, and efficient" manner, *see* 39 U.S.C. § 101. Where the Board finds, as it did here, that the anticipated revenues from the recommended rates will not meet the Service's total costs, it has an obligation ultimately to reject those rates. The anticipated revenue deficiency may be the result of a variety of causes. The deficiency the Board foresaw in this proceeding was in large part a result of the PRC's wrongful reduction of the Service's requested revenue levels. *See Newsweek*, 663 F.2d at 1203–06. We think that it is also possible that the source of a predicted revenue deficiency may be a faulty methodology employed by the PRC in formulating its recommended decision. Where the Board finds on the basis of record evidence that a methodology will endanger the Service's balanced budget, the Board is empowered to reject the recommended decision, and implicitly, the methodology.

Of course, the Board carries a heavy burden whenever it rejects a recommended decision of the PRC to support its belief that the expected revenues would be inadequate. While the Board need not *prove* that the methodology will jeopardize revenues—an impossible showing before the rates take effect—it must clearly demonstrate "that the recommendation is likely not to produce the required revenue." 116 Cong.Rec. 27,-606 (1970) (remarks of Rep. Udall).

■ Under these standards, the Board has yet to meet its burden. The only statement by the Board concerning the impact

of the SRC concept on revenues appeared in its *Modification Decision* :

> We are also concerned about the future consequences of the service-related costs concept. These so-called service-related costs are actually fixed costs which do not vary with volume. If the volume of a category which receives priority in delivery declines, the pool of costs remain unchanged but will be spread over fewer pieces, increasing the per piece share of the mail to which the costs are apportioned. Any resulting diversion of volume from those categories, either to categories with lower delivery priorities or outside of the postal system, could have a spiraling effect, increasing the per piece share of costs borne by all mail.
>
> We are concerned that this defective costing concept could have uneconomic and unbusinesslike effects on the system. The dangers inherent in the concept of service-related costs may constrain the ability of the postal system to evolve new categories of mail based on actual service distinctions. We therefore believe that rejection of the service-related costs concept is the prudent as well as the correct course of action.

*Modification Decision* at 17–18, J. App., Vol. 1 at 356–57. The Board's findings that the SRC concept "could have a spiraling effect" and "could have uneconomic and unbusinesslike effects on the system" are insufficient to reject a costing determination by the PRC. The Board must demonstrate, with appropriate support, that the concept

is likely to have such effects. Accordingly, in remanding for the class by class explanations we discussed in Section III, *supra*, we also instruct the Board to submit additional data and explanations to meet its burden on this issue.

## V. *NEWSWEEK*

As we noted earlier, our decision in *Newsweek* was filed one day after the Board's modifications took effect. Accordingly, the PRC has never had an opportunity to formulate a recommended decision with the benefit of our guidance. In particular, in its three recommended decisions, the PRC has adamantly asserted that the Board has exaggerated the Service's revenue needs. We stated quite firmly in *Newsweek* that the PRC must accede to the Board's estimates of the Service's revenue needs. 663 F.2d at 1203–06. Had the PRC done so, the modifications now before us would likely have not occurred.[24] Were the PRC given the opportunity to do so now, we think the Board might well accept the fourth recommended decision of this belabored proceeding.

Consequently, in remanding this matter, we invite the Board to seek from the PRC a fourth recommended decision consistent with *Newsweek*.[25] The Board may, of course, stand by its modifications, in which case it will have to supply us with the class by class explanations and its justifications for discarding the SRC concept as we have instructed in Sections III and IV, respectively. By urging the Board to afford the

---

24. As a prerequisite to modification, the Board must determine that "the rates recommended by the [PRC] are not adequate to provide sufficient total revenues so that the total estimated income and appropriations will equal as nearly as practicable estimated total costs." 39 U.S.C. § 3625(d)(2). The Board could therefore not have exercised its modification option if the PRC had formulated rates which would have generated the revenues requested by the Board. *See* note 16, *supra*.

25. We ask the Board to afford the PRC an opportunity to comply with *Newsweek* by invitation rather than by instruction in order to ensure that our authority to retain jurisdiction will be unimpaired. Should the PRC respond with a recommendation acceptable to the

Board, we recognize that the modifications will become moot upon the institution of new rates. Inviting a further recommended decision from the PRC may also relieve the Board of its heavy burden of justifying rejection of the SRC concept, in the event that the PRC discards the concept in formulating its rates. However, should the Board choose not to solicit a fourth recommended decision and instead abide by its modifications, we wish to retain jurisdiction in order to review, if necessary, the explanations the Board would have to produce.

At least one party has urged us to remand this proceeding directly to the PRC rather than to the Board. We read 39 U.S.C. § 3628, however, to provide for remand only to the Board.

PRC an opportunity to recommend new rates which comport with our interpretation of the Act as set forth in *Newsweek*, however, we hope it will begin to repair the debilitating rift which has highlighted this rate-making proceeding and which threatens to subvert the partnership Congress foresaw between the two bodies.

## CONCLUSION

We hold that while the Board was empowered to modify the PRC's *Third Recommended Decision*, it has failed to provide the class by class explanations necessary to our review of the modifications under 39 U.S.C. § 3628. Additionally, we conclude that the Board has yet to meet its burden of justifying its rejection of the SRC concept. Accordingly, we remand to the Board for additional explanations and justifications on these matters. In the interim, the present rates will remain in effect, except for third class bulk mail, as discussed below.

We conclude that the Board exceeded its authority in setting permanent third class bulk rates. Unless the Board establishes temporary rates for that subclass before the mandate in this case issues, the third class bulk rates will revert to those extant prior to the Board's modifications.

Finally, we invite the Board to seek a fourth recommended decision from the PRC under the guidance of *Newsweek* in hope that further litigation of this proceeding will become unnecessary and the partnership between the Board and the PRC will be restored.

Remanded for further consideration in light of this opinion. No costs. The mandate shall issue in 45 days. We retain jurisdiction.