TIME, INCORPORATED; Newsweek, Inc.; The Reuben H. Donnelley Corporation; Mail Advertising Service Association International; Direct Mail/Marketing Association, Inc.; Mail Order Association of America; National Association of Greeting Card Publishers; American Business Press, Inc.; Associated Third Class Mail Users; American Retail Federation; Council of Public Utility Mailers; United Parcel Service of America, Inc., Petitioners,

v.

UNITED STATES POSTAL SERVICE, Respondent,

Direct Mail/Marketing Association, Inc.; Dow Jones & Company; The National Association of Greeting Card Publishers; Association of American Publishers; The Recording Industry Association of America, Inc.; United Parcel Service of America, Inc.; American Newspaper Publishers Association; Advertisers Distribution Services; Advertisers Postal Service Corp.; Magazine Publishers Association; Classroom Publishers Association; March of Dimes Birth Defects Foundation; National Newspaper Association; Mail Order Association of America; Parcel Shippers Association; Time, Incorporated; Newsweek, Inc.; Council of Public Utility Mailers; American Retail Federation; American Bankers Association, Intervenors.

Nos. 893–897, Dockets 81–4183, 81–4185, 81–4203, 81–4205 and 81–6216.

United States Court of Appeals, Second Circuit.

Submitted March 1, 1983.

Decided June 8, 1983.

David C. Todd, Patton, Boggs & Blow, Washington, D.C., submitted brief, for petitioner Mail Order Ass'n of America.

Eugene E. Threadgill, Connole & O'Connell, Washington, D.C., submitted brief, for petitioners American Retail Federation and Council of Public Utility Mailers.

George P. Williams, III, Robert L. Kendall, Jr., John E. McKeever, Margaret S. Woodruff, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., submitted brief for petitioner United Parcel Service of America, Inc.

Louis A. Cox, Gen. Counsel, Daniel J. Foucheaux, Jr., Asst. Gen. Counsel, Leslie A. Clark, Richard T. Cooper, Eric P. Koetting, Scott L. Reiter, U.S. Postal Service, Washington, D.C. (Joseph A. Califano, Jr., Dewey, Ballantine, Bushby, Palmer & Wood, Washington, D.C., of counsel), submitted brief, for respondent U.S. Postal Service.

John M. Burzio, Thomas W. McLaughlin, Hydeman, Mason, Burzio & Lloyd, Washington, D.C., Charles M. Waygood, Olwine, Connelly, Chase O'Donnell & Wehyer, New York City, submitted brief, for intervenor Time, Inc.

Toni K. Allen, Susan D. Sawtelle, Wald, Harkrader & Ross, Washington, D.C. (Diana M. Daniels, Newsweek, Inc., New York City, of counsel), submitted brief, for intervenor Newsweek, Inc.

Dana T. Ackerly, David L. Harfst, Covington & Burling, Washington, D.C., Robert L. Sherman, New York City, submitted brief, for intervenor Direct Mail/Marketing Ass'n, Inc.

David Minton, Loomis, Owen, Fellman & Howe, Washington, D.C., submitted brief, for intervenor Magazine Publishers Ass'n.

David F. Stover, Stephen L. Sharfman, Shelley S. Dreifuss, Washington, D.C., Postal Rate Com'n, submitted brief, for Postal Rate Com'n as amicus curiae.

Before LUMBARD, MESKILL and KEARSE,* Circuit Judges.

MESKILL, Circuit Judge:

This decision should bring to an end a major portion of the fifth general ratemaking proceeding under the Postal Reorganization Act of 1970, 39 U.S.C. §§ 101 et seq. (Act), a proceeding which has spawned two lengthy decisions by this Court, see Time, Inc. v. United States Postal Service, 685 F.2d 760 (2d Cir.1982); Newsweek, Inc. v. United States Postal Service, 663 F.2d 1186 (2d Cir.1981), cert. granted sub nom., National Association of Greeting Card Publishers v. United States Postal Service, 456 U.S. 925, 102 S.Ct. 1969, 72 L.Ed.2d 439 (1982), argued, 51 U.S.L.W. 3440 (U.S. Dec. 1, 1982), and which has exposed the tensions that exist between the two executive agencies charged with administering the postal system: the United States Postal Service and its Board of Governors (Board) and the Postal Rate Commission (PRC). We are now asked to complete our review, begun in Time, of the Board's Modification Decision [1] which substantially revised the schedule of rates and fees for postal services that had been propounded by the PRC in its Third Recommended Decision.[2]

We held in Time that the Board acted within its powers under 39 U.S.C. § 3625(d) (1976) when it modified the PRC's recommended rates for postal services in order to restore the almost $1 billion in revenues that the PRC had unlawfully trimmed from the Postal Service's estimated revenue requirements. Time, 685 F.2d at 767; see Newsweek, 663 F.2d at 1204–06. However, we remanded the case to the Board and retained jurisdiction because it had failed to provide class by class explanations of its

modifications and had failed to justify its rejection of a cost methodology employed by the PRC in formulating certain rates. Time, 685 F.2d at 773–74. We gave the Board the option on remand of either returning to the PRC for a fourth recommended decision in light of Newsweek and Time, or providing us with an explanation and justification of its modifications. Id. at 775. The Board opted for the latter course and on December 20, 1982 produced for our review its Further Explanation and Justification Supporting the September 29, 1981 Decision of the Governors of the United States Postal Service on Rates of Postage and Fees for Postal Services (Dec. 20, 1982), Supp.App. (Further Explanation). Our review is now limited to whether the Further Explanation of the Board adequately explains, based on substantial record evidence, the modifications made to the PRC's Third Recommended Decision.[3] 39 U.S.C. § 3628 (1976); 5 U.S.C. § 706 (1976). For purposes of this opinion, we assume familiarity with Newsweek and Time. We will, however, begin with a brief description of the ratemaking process and a synopsis of our prior decisions in Newsweek and Time.

Congress has created a unique legislative scheme that divides postal ratemaking authority between two independent executive agencies. See 39 U.S.C. §§ 201–02, 3601 (1976). The Postal Reorganization Act of 1970 vests authority in the Board "to establish reasonable and equitable classes of mail and reasonable and equitable rates of postage and fees" provided that such rates and fees generate "sufficient revenues so that the total estimated income and appropriations to the Postal Service will equal as nearly as practicable total estimated costs

---

* Judge Kearse replaced Judge Moore as a member of this panel following his death.

1. Decision of the Governors of the United States Postal Service on Rates of Postage and Fees for Postal Services (Sept. 29, 1981), J.App., Vol. 1 at 340–416.

2. Opinion and Recommended Decision Upon Further Reconsideration (Sept. 17, 1981), J.App., Vol. 8.

3. We reviewed the Board's Modification Decision without oral argument although briefs were submitted by the respondent United States Postal Service, petitioners and intervenors Time, Inc., Newsweek, Inc., Direct Mail/Marketing Association, Inc., Mail Order Association of America, American Retail Federation, Council of Public Utility Mailers, United Parcel Service of America, Inc., and Magazine Publishers Association, and the PRC as amicus curiae.

of the Postal Service." 39 U.S.C. § 3621 (1976). However, the Board must submit proposed rate changes to the PRC for its approval and evaluation in light of the policies and factors embodied in 39 U.S.C. § 3622(b) (1976). The PRC must afford interested parties an opportunity to comment on proposed rate changes and must return a decision to the Board which recommends rates sufficient to satisfy the Postal Service's estimated revenue requirements. 39 U.S.C. § 3624 (1976); *Newsweek,* 663 F.2d at 1203–06. The Board may then approve, allow under protest, reject, or modify the recommended decision in accordance with 39 U.S.C. § 3625 (1976).

Thus, the Board is the business manager of the Postal Service, in day-to-day control of policymaking and operations. It is responsible for determining revenue requirements based upon total estimated costs— fixed institutional costs and variable costs tied to volume, *see* 39 U.S.C. § 3621 (1976) —and is empowered to initiate a rate proceeding when revenue needs warrant rate increases, 39 U.S.C. § 3622(a) (1976). Whereas the Board is in charge of management, the PRC controls ratemaking. It is responsible for establishing postal rates, fees and classifications. 39 U.S.C. § 3622 (1976). Its primary responsibility in a rate proceeding is to allocate to each class of mail the direct and indirect costs attributable to that class in accordance with the congressional mandate that "each class of mail or type of mail service [shall] bear the direct and indirect postal costs attributable to that class or type plus that portion of all other costs of the Postal Service reasonably assignable to such class or type." 39 U.S.C. § 3622(b)(3) (1976). Because institutional costs are not directly attributable to individual classes of service, they have been allocated through the pricing process in accordance with the policies defined in 39

U.S.C. § 3622(b) (1976) (except subsection (3)).

Because the Board is obligated to ensure that the Postal Service maintains a balanced budget, 39 U.S.C. § 3621 (1976), Congress empowered the Board either to seek judicial review, reject and seek reconsideration, or, in some circumstances, to modify a recommended decision of the PRC. 39 U.S.C. § 3625(a) (1976). The Board cannot modify a recommended decision, however, unless it finds that the recommended rates are inadequate to generate "sufficient total revenues so that total estimated income and appropriations will equal as nearly as practicable estimated total costs," 39 U.S.C. § 3625(d)(2) (1976). In modifying recommended rates, the Board must, like the PRC, respect the policies underlying the Act, 39 U.S.C. § 3625(d)(1) (1976), including the requirement that each class of mail bear its attributable costs and a reasonably assignable portion of all other costs, 39 U.S.C. § 3622(b)(3) (1976).

In *Newsweek,* we considered the lawfulness of postal rates and fees that had been recommended by the PRC and allowed to take effect under protest by the Board.[4] 39 U.S.C. § 3625(c)(2) (1976). We held that the PRC had unlawfully encroached on the management authority of the Board when it trimmed almost $1 billion from the Postal Service's estimated revenue requirements. 663 F.2d at 1205. Shortly before *Newsweek* was decided, the Board issued its *Modification Decision* which drastically revised the rates and fees for postal services contained in the PRC's *Third Recommended Decision.* In *Time,* we considered the lawfulness of the Board's modifications. We held that the Board could lawfully exercise its modification powers under 39 U.S.C. § 3625(d) (1976) in order to restore $1 billion in revenues necessary to balance the

---

**4.** At issue in *Newsweek* was the PRC's first recommended decision, Opinion and Recommended Decision of the Postal Rate Commission (Feb. 19, 1981), J.App., Vol. 5. While *Newsweek* was *sub judice* in this Court, the PRC issued its second recommended decision, Opinion and Recommended Decision Upon Re-

consideration (June 4, 1981), J.App., Vol. 7, and its *Third Recommended Decision,* note 2 *supra.* Each recommended decision was substantially the same "as the PRC steadfastly clung to its position that the Board had overstated the Service's revenue needs." *Time,* 685 F.2d at 763.

Postal Service's budget.[5]  685 F.2d at 767. However, we remanded the case to the Board because its *Modification Decision* had failed to provide "class by class explanations for its modifications." *Id.* at 772; *see* 39 U.S.C. § 3625(e) (1976).

We also considered in *Time* the Board's purported rejection of the "Service-Related Cost" methodology (SRC) employed by the PRC to formulate certain rates. The Board and the PRC have been at loggerheads over the appropriateness of the SRC concept to ratemaking. The Board is steadfast in its opinion that SRC is unreasonable and founded upon questionable hypothetical assumptions. The PRC had embraced SRC in response to several decisions of the United States Court of Appeals for the District of Columbia Circuit that *required* the PRC to use SRC in devising postal rates. *See National Association of Greeting Card Publishers v. United States Postal Service,* 607 F.2d 392 (D.C.Cir.1979)(per curiam), *cert. denied,* 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980); *National Association of Greeting Card Publishers v. United States Postal Service,* 569 F.2d 570 (D.C.Cir.1976) (per curiam), *vacated as to other issues,* 434 U.S. 884, 98 S.Ct. 253, 54 L.Ed.2d 169 (1977). SRC creates a third tier of costs apart from attributable variable costs and unattributable institutional costs. This third tier, reasonably assignable costs, are institutional costs that can be reasonably assigned to individual classes of postal service by applying a cost avoidance analysis. Cost decisions lie at the heart of ratemaking. Because the Act requires that each class of postal service bear its attributable costs and reasonably assignable costs, 39 U.S.C. § 3622(b)(3) (1976), cost allocations set the base rate for each class of service. The

practical effect of SRC is to limit the effective scope of discretion in the pricing process by creating an additional category of assignable costs.

We held in *Newsweek* that the PRC was *not required* to employ the SRC concept in establishing rates, but that the PRC could use the methodology at its option, 663 F.2d at 1201, because the "choice of [cost] methodologies is normally within the province of the PRC." *Time,* 685 F.2d at 774. Although the $1 billion revenue deficiency identified in *Newsweek* was not due to SRC, but rather resulted from the PRC's unlawful reduction of the Postal Service's estimated revenue requirements, we recognized in *Time* that faulty costing methodologies can be the root cause of revenue deficiencies. *Time,* 685 F.2d at 774. Accordingly, we held that the Board could reject a recommended decision if substantial record evidence demonstrated that the costing methodology used by the PRC would likely endanger the Postal Service's balanced budget. *Id.* Because the Board in its *Modification Decision* had not shown how SRC was likely to jeopardize revenues, we invited the Board on remand to offer additional explanations and evidence to meet its "heavy burden." *Id.* at 774–75.

## DISCUSSION

In its *Further Explanation,* the Board purports to identify substantial record evidence both to explain its modifications to the rates recommended by the PRC and to justify its rejection of the SRC concept. Although the $1 billion revenue deficiency identified in *Newsweek* was not due to SRC, the Board nevertheless argues that the methodology is likely to jeopardize revenues, by a small margin initially, but by

---

**5.** We ruled in *Time* that the Board lacked power to modify permanent third class bulk mail rates because the PRC had not transmitted a valid recommended decision to the Board providing for such rates. 685 F.2d at 768. However, we permitted the Board to retain its "modified" rates as temporary rates under 39 U.S.C. § 3641 (1976). *Id.* at 769; *see Direct Mail/Marketing Association, Inc. v. United States Postal Service,* 555 F.Supp. 816, 823 (S.D.N.Y.1983) (sustaining validity of tempo-

rary third class bulk rate regular mail rates). Consequently, the Board's *Further Explanation* does not address its purported modifications of third class bulk rates. Because we did not retain jurisdiction over these rates, our opinion today does not apply to that portion of the Board's *Modification Decision* pertaining to bulk third class mail. *See* J.App., Vol. 1, at 360. The PRC recently issued its Opinion and Recommended Decision on Bulk Third-Class Rates (Dec. 23, 1982).

increasingly greater margins in the long run. In this rate proceeding, the PRC has identified approximately 64.2 percent of the Postal Service's revenue requirement as costs attributable to the various classes of service. Appendices to Opinion and Recommended Decision, App. D–1 at 4, J.App., Vol. 6. Rather than treat the balance of the revenue requirement as unattributable institutional costs allocable through the pricing process, the PRC applied SRC to ascertain costs that were reasonably assignable to various classes. Applying SRC, the PRC identified an additional 8.4 percent of the revenue requirement that was reasonably assignable to several classes, primarily preferential classes of service. *Id.*, App. J at 260. Because rates in those classes will necessarily increase due to SRC, the Board fears that large volume losses will result as users switch either into nonpreferential classes of service or out of the postal system entirely. As a result, the Board envisions the elimination of certain types of preferential service. *Further Explanation* at 123–26. In the Board's opinion, all nonattributable costs ought to be allocated through the pricing process in accordance with the factors detailed in 39 U.S.C. § 3622(b) (1976) (except subsection (3)). *Further Explanation* at 104 n. 73.

The Board specifically found that the SRC concept was likely to cause a revenue deficiency in the short run. The PRC had determined that SRC compelled both a classification change and a rate change within second class service. Accordingly, it established a new Red-Tag preferential subclass and created a 3.4 cent price differential between Red-Tag and nonpreferential second class service. The Board found that these changes were likely to lead to a revenue deficiency in second class service of between $23.9 and $68 million. *Further Explanation*, App. E, at 22, 25.

We will not rule on the merits of the Board's rejection of SRC in part because the Board has another legitimate basis for modifying the PRC's *Third Recommended Decision*—the unlawful reduction by the PRC of the Postal Service's estimated revenue requirements. When we remanded this case to the Board we had hoped that it would accept our invitation to return to the PRC for a fourth recommended decision in light of our opinions in *Newsweek* and *Time*.[6] Had it done so, the PRC presumably would have complied with our holding in *Newsweek* and restored the $1 billion in disallowed revenue to the rate structure. It is also possible, if not likely, that the PRC would have abandoned SRC in light of our decision in *Newsweek* that the methodology is not required. If the Board had sought and received a fourth recommended decision providing for the Board's estimated revenue requirement, the Board could not have rejected that decision unless it showed through substantial evidence that the cost methodology employed by the PRC was likely to cause a revenue deficiency. In this case, however, the Board's modification power was triggered by the PRC's wrongful reduction of the Postal Service's estimated revenue requirements, not by the deleterious effects of SRC.

■ We feel compelled to suggest, however, that had the PRC been given the opportunity to issue a fourth recommended decision providing for the Postal Service's full revenue requirements and it once again employed SRC in devising rates, the Board's justification for rejecting the methodology would be woefully inadequate to sustain its heavy burden. The Board's belief that SRC will require some types of preferential service to be eliminated in the long run has nothing to do with a balanced budget in the short run and, therefore, is an impermissible basis for rejecting a cost methodology adopted by the PRC. The most questionable aspect of the Board's reasoning is that it could be applied with equal force to any cost methodology employed by the PRC. While the Board has identified some evidence to support its theory that SRC will

---

**6.** In *Time,* we interpreted 39 U.S.C. § 3628 (1976) as providing for remand only to the

Board. 685 F.2d at 775 n. 25.

**40**

lead to a revenue deficiency in the short run, its evidence is inadequate—"an elaborate makeweight." Supp.Br. of the Mail Order Association of America at 21. The Board carried a heavy burden on this issue because the "choice of costing methodologies is a matter entrusted to the expertise of the PRC," a body "comprised of full-time economists and rate analysts whose function is to deal with the 'highly intricate problems of rate-making,' H.R.Rep. No. 91–1104, 91st Cong., 2d Sess. 5 (1970), *reprinted in* [1970] U.S.Code Cong. & Ad.News 3649 at 3654." *Time,* 685 F.2d at 774.

There is a further, more compelling, reason not to address the merits of the Board's justification for rejecting SRC. The Supreme Court will soon resolve in *Newsweek, Inc. v. United States Postal Service,* 663 F.2d 1186 (2d Cir.1981), *cert. granted sub nom., National Association of Greeting Card Publishers v. United States Postal Service,* 456 U.S. 925, 102 S.Ct. 1969, 72 L.Ed.2d 439 (1982), *argued,* 51 U.S.L.W. 3440 (U.S. Dec. 1, 1982), whether 39 U.S.C. § 3622(b)(3) (1976), which provides that each class of mail "bear the direct and indirect postal costs attributable to that class ... plus that portion of all other costs ... reasonably assignable to such class," requires the PRC to use SRC in devising rates. *See* 50 U.S.L.W. 3790 (U.S. Mar. 30, 1982). We are confronted with a delicate statutory allocation of power to which the scope of the Board's modification power under 39 U.S.C. § 3625(d) is central. Because the circumstances of this case are unlikely to be repeated given our holding in *Newsweek* and because the underlying dispute over SRC involves an issue *sub judice* in the Supreme Court, it would be unwise for us to address the scope of the Board's modification power beyond what we have already said in *Time* and *Newsweek.*

However, the inability of the Board to justify its rejection of the SRC methodology does not preclude approval of its modifications to the *Third Recommended Decision.* Several parties contend that the Board's modifications must respect the PRC's cost allocations. *See* Supp.Br. of Petitioner United Parcel Service of America,

Inc. at 15 n. 5; Br. of Intervenor Direct Mail Marketing Association, Inc. at 10–11. The PRC, appearing as *amicus curiae,* suggests that the Board must essentially replicate the procedures used by the PRC in devising rates. Br. of *Amicus Curiae* Postal Rate Commission at 21. We reject these arguments, and we have already rejected the argument that the Board's modification power is restricted to scaling up the entire rate schedule by a fixed percentage in order to recover the revenue deficiency. *Time,* 685 F.2d at 772 n. 18. The PRC's costing decisions in this case were founded upon two assumptions which are no longer valid: that SRC must be employed in devising rates and that the PRC need not accede to the Postal Service's estimate of its revenue needs. Because of the lapse of time and the changed circumstances we will permit the Board to rely on cost allocations that are supported in the record even though they have not been adopted by the PRC.

The Board's *Modification Decision* can be fairly characterized as a complete rejection of the rates and fees for postal services recommended by the PRC. In their place, the Board has resurrected and implemented the rates and fees originally proposed by the Postal Service. The Board explains that "the rates we placed into effect were the most consistent and integrated set of rates that we could adopt under the applicable statutory principles." Perhaps. *Further Explanation* at 4. Nevertheless, given (1) our decision in the current circumstances to tolerate without condoning the Board's rejection of SRC, (2) the need to modify the PRC's recommended rates in order to restore $1 billion in revenues, and (3) our decision in *Time* not to require the Board to remand to the PRC for yet another recommended decision, we believe the Board has identified sufficient evidence "to explain the basis for the particular class by class modifications and the rationale for the new interrelationships created." *Time,* 685 F.2d at 772 (footnote omitted).

The Board restored the bulk of the $947 million the PRC unlawfully slashed from the Postal Service's revenue requirements by raising to 20 cents the PRC's

recommended 18 cent rate for the first ounce of unpresorted first class letter mail. This decision finds substantial record support in the testimony of Don S. Allen, a Postal Service witness, and accords proper weight to the policies embodied in 39 U.S.C. § 3622(b) (1976). First class letter mail has a relatively low price elasticity and represents a large percentage of the Postal Service's total volume of mail. Thus, by raising rates in this class significant increases in revenues can be generated with minimal effect on volume. The Board convincingly argues that relying on other classes of service to bear the brunt of the revenue deficiency would require large disruptive rate increases "either because these classes are too small or because their volumes, however large, would decline precipitously."[7] *Further Explanation* at 29. Although third class mail also represents a large percentage of the Postal Service's total volume of mail, the Board considered its price sensitivity to be too great to risk serious loss of volume. Although the 20 cent rate represents a 233 percent price increase in the first class letter rate since 1970, Supp.Br. of Petitioner United Parcel Service of America, Inc. at 30, the Board demonstrates that even with the 20 cent rate, first class letter mail does not disproportionately contribute to institutional revenues.[8] *Further Explanation* at 33.

Although the 20 cent first class letter rate was by itself sufficient to recover the bulk of the revenue deficiency, the Board, to the chagrin of the PRC and other interested parties, proceeded to modify rates in other classes of service. The Board's explanation for these additional modifications is credible. Basically, the Board explains that it was necessary to modify rates in other classes of service in order to preserve historic rate relationships among the classes. Having carefully reviewed the Board's explanations, we are reasonably satisfied that the additional modifications are supported by the record and are consistent with the policies underlying the Act.

Accordingly, we deny the petition for review of the Board's *Modification Decision* as supplemented by its *Further Explanation* subject to the limitations described herein.

---

7. Of course, the relative inelasticity of first and third class mail is due in large measure to the Private Express Statutes which extend to the Postal Service monopoly power over letter mail. 18 U.S.C. §§ 1694–99 (1976).

8. The United Parcel Service of America, Inc. (UPS), contends that by imposing on first class mail the burden of recovering almost $1 billion in revenues, the Board is unlawfully discriminating against letter mail users who are captives of the Postal Service's monopoly power. UPS focuses on the disparity in cost coverages between the protected and non-protected mail classes: 168 percent for first class and 175 percent for third class versus an average of 123 percent for the remaining classes. *See* Supp.Br. of Petitioner United Parcel Service of America, Inc. at 31. These differences in contributions to institutional costs are not so great as to amount to "undue or unreasonable discrimination among users of the mails." 39 U.S.C. § 403(c) (1976). We are satisfied that the Board adequately accounted for the factors enumerated in 39 U.S.C. § 3622(b) (1976) in modifying rates for first class postal service.

The American Retail Federation and Council of Public Utility Mailers challenge the 3 cent presort discount for first class adopted by the Board contending that the discount ought to have been 4 or 5 cents. We find that there is sufficient record evidence to support the Board's explanation that the 3 cent discount most accurately reflects the true cost avoidance of presorted mail. *Further Explanation* at 42–45.