**MAIL ORDER ASSOCIATION
OF AMERICA, Petitioner,**

v.

**UNITED STATES POSTAL
SERVICE, Respondent.**

No. 91–1058, et al.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 14, 1993.

Decided Jan. 15, 1993.

Opinion filed Feb. 23, 1993.

As Amended March 10, 1993.

Daniel J. Foucheaux, Jr., Washington, DC, for U.S. Postal Service.

Douglas N. Letter, Attorney, Dept. of Justice, with whom Anthony J. Steinmeyer, Jacob M. Lewis and Jonathan R. Siegel, Attorneys, Dept. of Justice, Washington, DC, joined in the response to the motion, for the Dept. of Justice.

Before WALD, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge WALD.

WALD, Circuit Judge:

This appeal presents two narrow but complex statutory questions: First, when a private party seeks judicial review of a Postal Service order, may the Postal Service represent itself when its position is at odds with that of the Department of Justice? Second, does the Postal Reorganization Act ("PRA") permit the United States Postal Service ("USPS" or "Postal Service"), to seek judicial review of a rate that it permitted to take effect under protest, when the Department of Justice ("Department" or "DOJ") has refused categorically either to represent the Postal Service's views or to consent to the Postal Service's use of its own or outside attorneys? After a careful review of the PRA, the Hobbs Act, and statutory provisions governing the Attorney General's conduct and supervision of executive branch litigation, we conclude that, in each case, the Postal Service enjoys at least limited independent litigating authority. We base our conclusions on the language of and the clear congressional purposes animating the postal reform statute.

## I. FACTUAL BACKGROUND

We recount the facts here with only brief reference to statutory authority, which is discussed more fully below. As a preliminary matter, however, it is important to note that the Postal Service appears in two distinct capacities in this consolidated case. In one docket, No. 91–1073, the Governors of the Postal Service are petitioners seeking review of one aspect of a recommended decision of the Postal Rate Commission ("PRC").[1] In the others,[2] the Postal Service is the respondent in suits initiated by private mailers challenging the Governors' decision to allow other aspects of the recommended decision to take effect under protest and to send the matter back to the Rate Commission for reconsideration. The Postal Service's authority differs slightly in each posture.

On January 22, 1991, the Board of Governors of the Postal Service issued three decisions. In one, it allowed certain provisions of the PRC's recommended decision to take effect under protest and sent those matters back to the Rate Commission for reconsideration. In the second, it rejected certain classification provisions. In the third, it allowed another aspect of the PRC's recommended decision to take effect and sought judicial review of that matter. The Board's authority for these actions is 39 U.S.C. § 3625(c), which provides that the "Gover-

---

1. In most instances, the statute provides for judicial review of a final order of the Postal Service, not a "recommended decision" of the Postal Rate Commission. 39 U.S.C. § 3628. See *Association of American Publishers v. United States Postal Service*, 485 F.2d 768, 772 (D.C.Cir. 1973) (for purposes of judicial review, a decision of the Governors is an order of the Postal Service). As discussed below, however, the statute has a separate provision, § 3625(c), that specifically permits the Postal Service to seek judicial review of a Postal Rate Commission recommendation that has taken effect under protest.

2. Docket Nos. 91–1058, 91–1059, 91–1063, 91–1065, 91–1074, 91–1075, 91–1079, and 91–1080.

nors may, under protest, allow a recommended decision to take effect and (1) seek judicial review thereof under section 3628 of this title, or (2) return the recommended decision to the Commission for reconsideration...." Section 3628, in turn, provides in part:

§ 3628. **Appellate review**

A decision of the Governors to approve, allow under protest, or modify the recommended decision of the Postal Rate Commission may be appealed to any court of appeals of the United States, within 15 days after its publication by the public Printer, by any aggrieved party who appeared in the proceedings under section 3624(a) of this title. The court shall review the decision, in accordance with section 706 of title 5, and chapter 158 and section 2112 of title 28, except as otherwise provided in this section, on the basis of the record before the Commission and the Governors.

Thus, when the Governors of the Postal Service themselves are seeking judicial review under § 3625(c), the Postal Service itself is the petitioner. When the Governors allow a rate to take effect but return it to the PRC, private parties may challenge the Governors' decision, making the Postal Service the respondent.

The following day, January 23, 1991, the Postal Service sought the Department's consent to appear on its own behalf in its own action for judicial review, as well as in the anticipated private party challenges to its decisions with regard to other aspects of the PRC's recommended decision. The Postal Service sought this consent pursuant to 39 U.S.C. § 409(d), which provides:

§ 409. **Suits by and against the Postal Service**

(d) The Department of Justice shall furnish, under section 411 of this title, the Postal Service such legal representation as it may require, but with the prior consent of the Attorney General the Postal Service may employ attorneys by contract or otherwise to conduct litigation brought by or against the Postal Service or its officers or employees in matters affecting the Postal Service.

When the consent was not forthcoming and the jurisdictional deadline for filing approached, the Postal Service filed the petition in No. 91–1073 to perfect the Governors' decision to allow under protest and to seek judicial review. A Department of Justice representative at this time stated orally to a Postal Service representative that the Department had not granted consent for this filing.

On September 28, 1992, the Postal Service filed its petitioner's brief with this court in Docket 91–1073. The following day, it received a letter, dated September 25, 1992, in which the Department of Justice denied the Postal Service's request for self-representation in the cases in which it was a respondent. Making no mention of the Governors' own petition for review, the letter said that the Department would attempt to prepare a joint brief representing the views of the Commission and the Postal Service in the private party appeals (even though the Commission was not and is not a party to those actions). The Department sought, and the Postal Service provided, a draft brief outlining its positions on the issues raised in those appeals.

On October 27, 1992, however, the Assistant Attorney General of the Department's Civil Division wrote to the General Counsel of the Postal Service:

Because the United States Postal Service and its Governors lack independent litigation authority, see 28 U.S.C. § 516, 39 U.S.C. § 409(d), the Attorney General's authorization is a necessary precondition to the filing of such a petition for review by Postal Service attorneys. In this case, authorization was not provided because a lawsuit between the Postal Service and the Postal Rate Commission raises serious justiciability problems under Article III of the United States Constitution. As we discussed with your predecessor, ... we have grave doubts that the Attorney General could authorize the filing of a lawsuit that he believes is not within the judicial power of the United States courts.

The Assistant Attorney General asked the Postal Service to withdraw its petition for

review and suggested that, should it not, the Department of Justice would move to strike the petition on the ground that it was filed by attorneys lacking the requisite authority.

On November 3, 1992, the DOJ provided the Postal Service with a draft brief that the Department proposed to file on the Postal Service's behalf. On November 6, 1992, the Postal Service, maintaining that the DOJ's draft and subsequent revisions departed from the Postal Service's key positions in critical respects, filed a motion in this court for leave to appear as a party and to represent itself in all of the consolidated dockets. In response, on December 8, 1992, we ordered the Department of Justice either to "resolve the controversy between the DOJ and the Postal Service or to file a response to the November 6 motion to enable the Court to resolve it itself."

Subsequently, on December 11, 1992, the President of the United States wrote to the Postmaster General directing him and the Board of Governors to "cooperate fully with the Attorney General in arranging for the withdrawal of [the Service's] filings." On January 4, 1993, the Chair of the Board of Governors responded to the President that a majority—although not all—of the Governors believed the Board was authorized to maintain its position in the Court of Appeals and asked the President to elaborate on his December 11 directive. The same day, the President responded that "in order to obtain compliance with the statutes and my directive enforcing them, I will if necessary remove Governors of the Postal Service."

On January 7, 1993, on the motion of the Governors who maintained the Board's right of self-representation, the United States District Court for the District of Columbia issued a preliminary injunction prohibiting the President from removing those Governors. On January 8, the Department of Justice filed in this court an emergency motion for a stay or reversal of that order. At the same time, the Department filed, purportedly on behalf of both the PRC and the Postal Service, a motion

for voluntary dismissal of the Postal Service's petition for review.

On January 15, 1993, after oral argument, we issued an order granting in part the Postal Service's motion for self-representation. In Docket 91–1073, the Postal Service's own petition for review, we agreed to accept the brief filed by the Postal Service. In the remaining dockets, the private mailer suits in which the Postal Service was respondent, we returned the Postal Service's brief and ordered it to file a supplemental brief setting forth its position only to the extent that it was "fundamentally different" from that taken by the DOJ in its November 9, 1992 respondent's brief. We stated that an opinion explaining our decision would be forthcoming. This is that opinion.

## II. STATUTORY BACKGROUND

This case calls on us to decide the Postal Service's independent litigating authority with respect to the judicial review of decisions by its Board of Governors. This authority depends on the relationship between and the application of several statutes, including the Postal Reorganization Act, the Hobbs Act, and the provisions of title 28 dealing with the Attorney General's power to direct and supervise litigation. We discuss them in turn.

### A. Postal Reorganization Act

The Postal Reorganization Act of 1970 marked a dramatic break with the past. Prior to its enactment, the Postmaster General was a member of the President's cabinet, and Congress set postal rates and, through a system of patronage, selected many postal officers and employees. In 1970, however, Congress took itself out of the ratesetting and patronage processes and replaced the Post Office Department, a cabinet agency, with two "independent establishment[s] within the executive branch of the Government of the United States," 39 U.S.C. §§ 201, 3601, the United States Postal Service and the Postal Rate Commission.

The Postal Service is governed by an eleven-member Board of Governors, which

has broad authority to manage the Postal Service. Nine of its members, the Governors, are appointed by the President, with the advice and consent of the Senate. They can be removed only for cause. *Id.* § 202(a). The Governors, in turn, appoint the Postmaster General, while the Governors and the Postmaster General together appoint the Deputy Postmaster General. 39 U.S.C. § 202(c) and (d). This Board has a wide array of general powers, including the power to sue and be sued, to acquire property, to enter into contracts, and to spend money. *Id.* § 401. Most significant to this case, the Board has the authority to set postage rates and fees and classifications of mail. *Id.* § 3621. The Postal Rate Commission has five members, appointed by the President with the advice and consent of the Senate. *Id.* § 3601. Its primary powers are to hold hearings on the Board's requests for rate and classification changes and to issue recommended decisions in response to these requests. *Id.* §§ 3622, 3624.

The Postal Reorganization Act creates a unique and interdependent relationship between these two "independent establishments" in the executive branch. Although ultimate ratesetting authority resides with the Board, it can exercise that authority only after comprehensive review and recommendation by the Postal Rate Commission. The Act's three-step ratesetting process thus establishes a delicate balance of authority between the Governors and the PRC. As a first step, the Postal Service requests a recommended decision from the PRC. *Id.* § 3622(a). Second, the PRC, after holding hearings and considering certain statutory factors, makes its recommendation to the Board. *Id.* §§ 3623(c), 3624. And third, the Board responds to the recommendation in one of four ways. *Id.* § 3625. First, and most simply, the Board may approve the recommendation. In this case, the rate goes into effect on a date determined by the Board of Governors. *Id.* § 3625(f). Second, the Board may allow the rate to take effect under protest and seek either reconsideration by the PRC or judicial review. *Id.* § 3625(c). Third, the Board may reject the recommendation and

seek the Commission's reconsideration. *Id.* § 3625(d). Only after the Commission has submitted a further recommended decision may the Postal Service exercise its fourth option of modifying the recommendation; ' even then, a modification requires the members' unanimous written approval. *Id.*

At first glance, the most troublesome of these options, and one that is at issue here, is allowance under protest with judicial review. When exercising this option, the Board is at once permitting a decision to go into effect and challenging it in court. On the surface, the Board would seem to be both the decisionmaker and the party aggrieved by the decision. As we discuss below, however, a careful parsing of the statute, reinforced by the Act's legislative history, demonstrates two things. First, in this limited circumstance, Congress has created a sort of passthrough mechanism, by which the Board of Governors is effectively standing aside to permit the recommended decision to take effect, then challenging that decision. Second, Congress intended precisely this dynamic as a means to achieve the overriding policy concern of providing the Postal Service timely revenue increases, without requiring the Board of Governors to abdicate its ratesetting authority.

Thus, in analyzing the Board's actions in permitting the rate to go into effect and seeking judicial review, we recognize first that its actions are governed by §§ 3625(c) and 3628. Significantly, judicial review under § 3628 is to be conducted in accordance with chapter 158 of title 28, known as the Hobbs Act, which governs judicial review of the orders of certain federal agencies. Relevant portions of the Hobbs Act, discussed below, spell out the respective rights and responsibilities in these proceedings of the Department of Justice, the agency whose order is under review, and the party challenging the order.

The PRA's incorporation of the Hobbs Act is not, of course, the statute's only reference to the conduct of Postal Service litigation. We have already mentioned § 409(d), providing for the Department of Justice's furnishing of the Postal Service's

legal requirements or its consent to the Service's self-representation. This section in turn references 39 U.S.C. § 411:

### § 411. Cooperation with other Government agencies

Executive agencies within the meaning of section 105 of title 5 and the Government Printing Office are authorized to furnish property, both real and personal, and personal and nonpersonal services to the Postal Service, and the Postal Service is authorized to furnish property and services to them. The furnishing of property and services under this section shall be under such terms and conditions, including reimbursability, as the Postal Service and the head of the agency concerned shall deem appropriate.

Additionally, two other provisions of § 409 govern Postal Service litigation. Subsections (b) and (c) enumerate those provisions of title 28 that apply in Postal Service litigation. These subsections state, in their entirety:

(b) Unless otherwise provided in this title, the provisions of title 28 relating to service of process, venue, and limitations of time for bringing action in suits in which the United States, its officers, or employees are parties, and the rules of procedure adopted under title 28 for suits in which the United States, its officers, or employees are parties, shall apply in like manner to suits in which the Postal Service, its officers, or employees are parties.

(c) The provisions of chapter 171 and all other provisions of title 28 relating to tort claims shall apply to tort claims arising out of activities of the Postal Service.

39 U.S.C. § 409(b) and (c).

### B. Attorney General's Litigation Authority

Although not included among those provisions of title 28 that are expressly incorporated by § 409, two other provisions of title 28 are relevant here:

### § 516. Conduct of litigation reserved to Department of Justice

Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General.

### § 519. Supervision of litigation

Except as otherwise authorized by law, the Attorney General shall supervise all litigation to which the United States, an agency, or officer thereof is a party....

28 U.S.C. §§ 516, 519.

### C. The Hobbs Act

As stated above, all judicial reviews of Postal Service or Postal Rate Commission orders must be conducted in accordance with the Hobbs Act. The Hobbs Act provision most relevant to this case states:

### § 2348. Representation in proceeding; intervention

The Attorney General is responsible for and has control of the interests of the Government in all court proceedings under this chapter. The agency, and any party in interest in the proceeding before the agency whose interests will be affected if an order of the agency is or is not enjoined, set aside, or suspended, may appear as parties thereto of their own motion and of right, and be represented by counsel in any proceeding to review the order. Communities, associations, corporations, firms, and individuals, whose interests are affected by the order of the agency, may intervene in any proceeding to review the order. The Attorney General may not dispose of or discontinue the proceeding to review over the objection of any party or intervenor, but any intervenor may prosecute, defend, or continue the proceeding unaffected by the action or inaction of the Attorney General.

### III. ANALYSIS

The Postal Service relies on § 3628, the judicial review provision of the PRA, with its incorporation of the Hobbs Act, to argue that in suits brought by private parties, the Postal Service is entitled to appear on its own motion and of right and to be

represented by counsel, regardless of the stance the Attorney General takes in the proceeding. Moreover, it argues, the structure of the PRA's ratemaking procedure, which spells out the Postal Service's options in response to a PRC recommended decision, makes it clear that Congress intended that the Postal Service have independent authority to initiate such review. The Department of Justice, on the other hand, cites §§ 516 and 519 of title 28 and § 409 of the Postal Reorganization Act to support its argument that the Postal Service is not authorized to appear in court without the participation or consent of the Attorney General.

▮ After a careful review of these statutes and of the legislative history of the PRA, we conclude first, that when the Postal Service seeks judicial review under § 3625(c), it may do so on its own if the Department of Justice has declined to represent its fundamental positions or to consent to its self-representation; and second, that when a private party challenges a Postal Service order under § 3628, the Postal Service is entitled to appear and be represented by its own counsel when its position is inconsistent with that of the Department of Justice.

Our conclusion is supported by accepted principles of statutory construction, by the legislative history of the PRA, and by case law construing the PRA and other statutes. We stress, however, that we are not deciding that, as a general matter, the Postal Service can initiate litigation without the participation or consent of the Attorney General. Under § 409 of the PRA and 28 U.S.C. §§ 516, 519, the Postal Service may well be required to obtain the Attorney General's aid or consent before initiating a lawsuit, including actions involving torts, contracts, employment relations and other matters. That is a distinct question, not before us, so we do not resolve it here. Rather, we confine our opinion specifically to the authority of the Postal Service in two judicial review situations: either where the Postal Service itself initiates review under § 3625(c) or where a private party challenges a Postal Service order under § 3628.

▮ In resolving this dispute, we are guided by several principles of statutory construction. First, we are to construe statutes, where possible, so that no provision is rendered " 'inoperative or superfluous, void or insignificant.' " *Public Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1285 (D.C.Cir.1983) (quoting 2A DALLAS SANDS, SUTHERLAND STATUTORY CONSTRUCTION § 46.06 (4th ed. 1973)). Moreover, we are to attempt to reconcile two statutes on the same subject, so that one does not repeal the other by implication. *United States v. Borden Co.*, 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939). Finally, we are to prefer the more specific statute over a conflicting general one. *United States v. Chase*, 135 U.S. 255, 260, 10 S.Ct. 756, 757, 34 L.Ed. 117 (1890).

Working from general to specific, 28 U.S.C. §§ 516 and 519 provide for the Attorney General's conduct and supervision of executive branch litigation "[e]xcept as otherwise authorized by law." The question then becomes whether the PRA has "otherwise authorized." Section 409(d) of the PRA, which deals with the entire range of suits "by and against" the Postal Service, provides the starting point for an answer: the Postal Service may either employ attorneys "furnished" by the Department of Justice to meet the Service's requirements, or may use its own attorneys with the "prior consent" of the Attorney General. The Department of Justice contends that this provision gives it full discretion to furnish or withhold legal representation (in effect, to determine what legal representation the Postal Service "may require"), and gives the Attorney General full discretion to grant or withhold consent for the Postal Service to proceed on its own.

If § 409(d) were to be read in isolation, the Department's argument would be more persuasive. Section 409(d), however, provides that the Department of Justice "shall furnish" the Postal Service legal representation "under section 411 of this title." Section 411, which deals with cooperation with other Government agencies, autho-

rizes "agencies"—a term that includes the Department of Justice—to furnish property or "services" to the Postal Service "under such terms and conditions, including reimbursability, as the Postal Service and the head of the agency concerned shall deem appropriate." Read in conjunction with this provision, § 409(d) could be construed to give the Department of Justice a sort of "right of first refusal" for Postal Service representation. The Postal Service would be required first to seek representation from the Department. If the Department declined, it would be expected, in the spirit of cooperation established in § 411, to consent to the Postal Service's self-representation.[3]

We need not decide, however, which is the correct reading of § 409(d) generally, for we are dealing only with the narrower question of its application to the Governors' right under § 3628 to appear with counsel when one of its orders is under judicial review or to seek judicial review under § 3625(c) of a Rate Commission recommendation. We analyze each posture separately.

### A. Postal Service's Authority to Appear in Judicial Review Proceedings

We are concerned in the first instance with the Postal Service's litigation authority when one of its decisions is challenged by a private party under § 3628. This applies to all of the dockets in this consolidated case, except for Docket 91–1073. For this application, we look both to § 409(d), which applies to Postal Service litigation in general, and to § 3628, which directly addresses the judicial review that we are exercising here. As we attempt to reconcile these provisions, to give effect to each, and to prefer the more specific provision, we can only conclude that § 3628 serves as a qualification, but not an outright exception,

to § 409(d). We therefore must apply § 409(d) in this instance to reflect the express provisions of and congressional intent behind § 3628.

We start, then, with § 3628, which expressly requires that judicial review be conducted in accordance with the Hobbs Act. Against this express requirement, we find nothing in the legislative history that makes inapplicable the Hobbs Act's provisions relating either to an aggrieved party's right to representation or to an agency's right to represent itself when its position is hostile to that of the Justice Department. We thus conclude that Congress intended in this context to invoke the customary construction of the Hobbs Act.

The analysis is then quite straightforward. First, § 3628 provides that an aggrieved party who appeared in the proceedings before the Postal Rate Commission may appeal a decision by the Board of Governors to approve, allow under protest, or modify the PRC's recommended decision. This section further provides that such review is to be conducted in accordance with the Hobbs Act. Second, § 2348 of the Hobbs Act provides that the agency whose order is subject to review—here the Postal Service—"may appear as [a] part[y] ... of [its] own motion and as of right, and be represented by counsel in any proceedings to review the order." Thus, the Postal Service is entitled to appear as a party in this action and to be represented by counsel.

Next, we inquire whether the DOJ's filings purportedly on behalf of the Postal Service necessarily satisfy the Postal Service's Hobbs Act rights in this instance. The plain language of the statute makes clear that they do not. The first sentence of § 2348 provides that "[t]he Attorney General is responsible for and has control

---

**3.** Other provisions of § 409 support the conclusion that it falls within the "otherwise authorized" exceptions to §§ 516 and 519. Subsections (b) and (c) enumerate those provisions of title 28 that apply in Postal Service litigation. These include such matters as service of process, venue, and limitations of time for bringing action in suits involving the United States, and provisions relating to tort claims against the

United States. 39 U.S.C. § 409(b) and (c). Sections 516 and 519 are not included. While we recognize that these latter provisions have independent force and need not necessarily be incorporated into each agency's authorizing statute, we believe that, given the particular context of the postal reform bill, their exclusion may be significant here. *See infra* 518–21.

of the interests of the Government in all court proceedings under this chapter." It is thus indisputable that the Attorney General has a right to represent the "Government's" interest in this proceeding. Juxtaposed against this statement, however, is the assertion that the agency *itself* has the right to appear as a party and to be represented by counsel. The most sensible construction of these two sentences is that, while the Attorney General represents the Government's interests, the agency itself has an independent right to appear to represent its own interests that do not coincide with those of the Government.

This is, indeed, the construction we have given this provision. In *United States v. Federal Maritime Commission*, 694 F.2d 793 (D.C.Cir.1982) ("*FMC*"), we discussed the respective roles of the Department of Justice and an "agency" or "aggrieved party" under § 2348 of the Hobbs Act. In *FMC*, the DOJ petitioned under the Act, 28 U.S.C. § 2342(3), for review of an order entered by the Federal Maritime Commission. The court first determined that the DOJ was a "party aggrieved" entitled to seek review under § 2348 of the Act. We then quickly concluded that the statute "permits the Justice Department and [the] agency to take inconsistent and even hostile positions on review of an agency order, for the agency has the right to take independent action in its own interest." *Id.* at 796. Examining the language and structure of the Hobbs Act, we concluded that it

> neither requires the Attorney General to defend agency orders nor precludes an independent agency defense. Section 8 provides that the agency may "appear as a party ... of its own motion and of right," and that the Attorney General may not "dispose of the proceeding for review over the objection of any party." 28 U.S.C. § 2348. We interpret this language to contemplate that the Department may choose to (1) defend the order, solely or in conjunction with the agency, (2) remain completely passive, or (3) confess error, and attack the order, even though a statutory co-respondent. In no instance is the agency left defenseless;

the agency can always defend itself, as the Commission has done here.

*Id.* at 803. We cited to a hearing on the Hobbs Act, in which the primary drafter of this provision stated:

> I do not think that it is incumbent upon the Attorney General to remain silent. He may say to the court of appeals—he may say to the Supreme Court—I think the law is this way; I think the position taken by the [agency] is wrong.
>
> But, likewise, the [agency] through its counsel may say we think the Attorney General is wrong; we think the law is this way; we think the case should be decided this way for these reasons.

*Id.* at 807 (quoting *Providing for the Review of Orders of Certain Agencies: Hearings on H.R. 2915, 2916 Before Subcomm. No. 2 of the House Comm. on the Judiciary*, 81st Cong., 1st Sess. 115, 118 (1949) (testimony of Chief Judge Orie L. Phillips, Chair of the Judicial Conference Committee addressing judicial review of agency orders)).

■ The posture of the parties is somewhat different here than in *FMC*. There, the DOJ was the aggrieved party attacking the agency order; here it is the purported defender of the agency (despite its advocacy of some positions that are antithetical to those of the agency). The *FMC* reasoning is nonetheless applicable here: In proceedings for judicial review under the Hobbs Act, an agency is entitled to take a position inconsistent with or hostile to that of the DOJ. And, according to the specific provisions of the Hobbs Act, it has a right to be represented by counsel.

The only remaining question is how to reconcile this construction with § 409(d)'s provisions relating to the Attorney General's role in Postal Service litigation. Specifically, when a private party seeks judicial review of a Postal Service order, and the DOJ declines to represent the Postal Service's position or consent to its self-representation, does § 409(d) bar the Postal Service from appearing as a party and being represented by counsel? We conclude that it does not. The general requirements of § 409 cannot be read to thwart the clear

congressional intent that this review be conducted in accordance with the Hobbs Act, which entitles the Postal Service to appear with counsel. On the other hand, we do not read § 3628 to render § 409(d) " 'inoperative or superfluous, void or insignificant.' " *Public Citizen Health Research Group*, 704 F.2d at 1285 (citation omitted). Instead, the congressional intent expressed in § 409(d) that the Postal Service coordinate its litigation through the DOJ does require that the Postal Service first seek legal representation or consent to self-representation from the DOJ. But the denial of that request does not deprive the Postal Service of its rights under the Hobbs Act to present its positions in this proceeding.

## B. *The Postal Service's Right to Initiate Review*

Of course, congressional intent to allow the Postal Service to *appear* on its own terms in actions challenging its orders is not the same as an intent to permit the agency to *initiate* a review proceeding in the absence of the Attorney General's consent. We find such an intent, however, in the specific language of §§ 3625(c) and 3628, in the structure of the congressionally-crafted ratemaking provisions, and in the legislative history of the PRA, which together reveal an unmistakable congressional design to accord the Postal Service the autonomous right to initiate judicial review of the PRC recommendations that it allows under protest.

We start with the language of the statute. First, § 3625(a) of the PRA provides that, "[u]pon receiving a recommended decision, from the Postal Rate Commission, the Governors may ... allow under protest ... that decision in accordance with the provisions of this section." The relevant provisions of that section are found in § 3625(c), which provides that, when the Governors allow a recommended decision to take effect under protest, they may "seek judicial review thereof under section 3628 of this title...." Language and logic indicate that judicial review "thereof" is review of the PRC's recommended decision. Thus, in this limited circumstance, Con-

gress intended that the PRC's recommended decision, which has taken effect, be a reviewable order. Section 3628, in turn, provides for judicial review of decisions "by an aggrieved party who appeared in the proceedings under section 3624(a) of this title." Section 3624(a) provides that the Rate Commission's proceedings should accord an opportunity for a hearing to, among others, the Postal Service.

We read these provisions together to provide that, when the Governors seek judicial review of a PRC recommendation, they do so as an "aggrieved party" under § 3628 of the PRA, and consequently, under § 2348 of the Hobbs Act. Stated another way, when the Governors seek judicial review under § 3625(c) of a PRC recommendation, they are effectively claiming that they are "aggrieved" by that decision.

We next inquire what rights the Hobbs Act affords such an aggrieved party. Under § 2344 of that Act, any "party aggrieved" by an order reviewable under the Act may petition for its review in a court of appeals. Under § 2348, "any party in interest in the proceeding before the agency whose interests will be affected if an order of the agency is or is not enjoined, set aside, or suspended, may appear as parties thereto, of their own motion and as of right, and be represented by counsel in any proceeding to review the order." The Postal Service is, therefore, entitled to appear as a party and be represented by counsel in any judicial review proceeding.

Of course, in the typical Hobbs Act litigation, the "party aggrieved" is a private party contesting an agency action. In that situation, the aggrieved party's right to appear is unaffected by the Attorney General's litigating authority. In this peculiar situation, however, in which a federal agency is an aggrieved party, we must inquire whether its right to appear and be represented by counsel is subject to the Attorney General's control—and therefore, veto. Review of the legislative history of the Postal Reorganization Act leads us to conclude that it is not. Instead, it is clear that Congress considered meaningful judicial review of PRC/Postal Service disputes to be

an integral part of a carefully crafted rate-making structure, and that we should therefore construe the statute to preserve this option.

The Postal Reorganization Act grew out of congressional frustration with postal inefficiency. Both houses emphasized that the key to ending this inefficiency was to give the nation's postal service more independence—independence from political pressures and independence to manage its operations in a professional, businesslike manner. *See* H. REP. NO. 1104, 91st Cong., 2d Sess. 6 (1970), *reprinted in* 1970 U.S.C.C.A.N. 3649, 3654 ("House Report") ("[T]he Post Office must be taken out of politics and politics out of the Post Office."); *id.* at 3661 (citing "wide agreement" that "one of the cardinal needs of postal reform is to seal off the Postal Service from partisan political influence"); S. REP. NO. 912, 91st Cong., 2d Sess. 8 (1970) ("Senate Report") ("The elimination of politics in the selection of ... officers or employees of the postal service is, in the last analysis, the moral and ethical responsibility of the President and the Board of Governors.").

The structure established by Congress—two independent agencies, with a Board of Governors at the head of the Postal Service—was deliberately chosen to promote this desired independence. The first step toward that end was removing the Post Office from the President's cabinet.[4] As a second step, the Board of Governors was to provide "an invaluable buffer between the management of the Postal Service and the possible influence of partisan politics." House Report at 12, 1970 U.S.C.C.A.N. at 3660. The Senate similarly perceived the Board of Governors as "independent of ordinary legislative and executive supervision and control." Senate Report at 4. The Chair of the Senate Committee on the Post Office and Civil Service, which drafted the Senate bill, echoed that the legislation "isolat[ed] the postal service from Presidential or congressional control over its program activities, and ... protect[ed] the Chief Executive officials from political influence through the Board of Governors." 116 CONG. REC. at 21712 (statement of Sen. McGee).

The purpose of this political independence was managerial independence. The Postal Service was to have "unfettered authority and freedom ... to maintain and operate an efficient service." Senate Report at 2; *id.* at 2, 3 (concerned that the Postmaster General was "blocked or undercut at every turn," the Committee sought to provide more control over costs and revenues and greater continuity of top management). The "day-to-day management of the Postal Service" was to be "removed from both presidential and congressional areas of concern." House Report at 13, 1970 U.S.C.C.A.N. at 3661. The Board of Governors was to have "policy control" with functions similar to a board of directors, while the Postmaster General was to be the "operating head" of the Postal Service. 116 CONG. REC. at 19845 (statement of Rep. Dulski). The independence of the Postal Service was so great that one representative feared that the Postmaster General would become "the absolute czar of the Postal Service, ... completely and effectively remove[d] ... from any possible control by the people or the people's elected representatives." 116 CONG. REC. at 19848

---

4. *See* House Report at 12, 1970 U.S.C.C.A.N. at 3660:

> [T]he Postmaster General's presence in the President's Cabinet creates a link between partisan politics and the Postal Service that cannot be dissolved by simple statutory prohibitions on "political influence." As long as the top postal manager serves at the pleasure of the President, he will find it nearly impossible to disassociate himself from the informal obligations of the President's official family. And as long as the Postmaster General is appointed by the President, even if a fixed statutory term is prescribed, the probability is

that his service will, in practical consequences, be "at the pleasure of" the President. Senator McGee, Chair of the Senate Committee on Post Office and the Civil Service, echoed this view:

> [U]nless that system [of having the Postmaster General in the President's cabinet] is changed, we believe that the nature of our political institution will continue to make the Post Office heavily reliant upon the policies and programs of the encumbent [sic] political party and administration.

116 CONG. REC. 21708 (statement of Sen. McGee).

(statement of Rep. Gross). To ensure this operational freedom, Congress established a scheme in which:

> The Board of Governors shall have broad authority and shall not, except as specified, be subject to Federal laws dealing with contracts, property, the civil service system, the Budget and Accounting Act of 1921, and other laws which in most instances apply to Government agencies and functions.

Senate Report at 5; 39 U.S.C. § 410.

Although the two houses agreed on the need for political and operational independence, they differed initially on the specific structure and allocation of ratemaking authority between the Postal Service and the Postal Rate Commission.[5] The original House bill created the Postal Rate Commission (which it referred to as a "Rate Board") as a completely independent agency, while the Senate established it within the Postal Service. The House, but not the Senate, provided for a one-house congressional veto of rates adopted by the Board, while the Senate, but not the House, included the allowance under protest option. The Conference Committee adopted elements of each bill. It made the PRC an independent agency, eliminated the congressional veto, and incorporated the Senate's "allowance under protest" option and its more limited Postal Board modification provision. H. REP. No. 1363, 91st Cong., 2d Sess. 6 (1970),

reprinted in 1970 U.S.C.C.A.N. 3712, 3717 ("Conference Report").

This legislative history demonstrates that Congress carefully crafted a unique ratemaking structure that created a deliberate tension between the Postal Service and the Rate Commission. Neither entity alone could effect rate changes. The Board of Governors' broad ratemaking authority was checked by its need for a PRC recommendation, but the PRC was by no means given an absolute veto over the Governors' actions. The Governors' power to modify a PRC recommendation, for example, was designed as a means—other than judicial review—by which the Governors could prevent the PRC from getting "a complete strangle hold over any and all service changes which the Postal Service would like to make." 116 CONG. REC. 22053 (statement of Sen. Fannin). At the same time, this power to modify was sharply circumscribed: it became effective only after the Commission had reconsidered its recommendation and only with the written approval of each of the Governors. *Id.* § 3625(c) & (d). *See also* Senate Report at 13 ("The limited circumstances under which a recommended rate decision made by the Commission may be modified by the Governors are spelled out in the language of the bill."); *Association of American Publishers, Inc. v. Governors of USPS,* 485 F.2d 768, 777 n. 4 (D.C.Cir.1973) (Bazelon, J., concurring) (Although the PRC "technically ... merely renders a 'recommended deci-

---

5. The ratemaking provisions received considerable scrutiny both in committee and on the floor. The House Post Office and Civil Service Committee's version of the PRA was the result of fourteen months "of almost total immersion in [the] controversial and complex subject [of postal reorganization]." House Report at 8, 1970 U.S.C.C.A.N. at 3657. The Senate Committee reported its bill after "one of the longest and most intensive studies in the committee's history." Senate Report at 1. The bill's ratemaking provisions were the focus of many of the committees' hearings. *See, e.g., Postal Modernization: Hearings Before the Senate Comm. on Post Office and Civil Service,* 91st Cong., 1st Sess. 503–53, 593–679, 907–28 (1969).

The precise contours of the ratemaking structure were again debated at length on the floor of both houses before being worked out in the Conference Committee. For example, the House considered an amendment that would

have given the Postal Rate Commission final authority to approve rates. That body defeated the amendment after one member objected that it would deny the Postal Service "the necessary involvement it must have in proposed changes in rates and classifications and ... insert[ ] the postal rate [commission] in an area where the postal service should properly function." 116 CONG. REC. at 20454 (statement of Rep. Derwinski). The Senate, in turn, defeated an amendment that would have substituted the language of the House bill, after a colloquy between the chair and the ranking member of the Post Office and Civil Service Committee, which highlighted as the "basic philosophical difference" between the two approaches the Senate's grant of greater independence to the Rate Commission, to keep it from being "subservient" to the Postmaster General and the Board of Governors. 116 CONG. REC. 22052 (statements of Sen. McGee and Sen. Fong).

sion,' . . . the power of the Board of Governors to revise that opinion is extremely narrow."). In short, this was not a piecemeal or haphazard effort, but an attempt to create a "comprehensive procedure for rate setting and service changes." House Report at 11, 1970 U.S.C.C.A.N. at 3659.

The allowance under protest option must be seen as an integral component of this complex and delicate structure negotiated in Congress. *See* Senate Report at 17 ("The Governors have other possible courses of action open to them on receipt of a recommended decision from the Rate Commission. They may, in the exercise of their discretion, implement a recommended decision of the Rate Commission under protest."). Its importance is underscored by the congressional focus on "timeliness in the rate-making process," which Congress deemed "imperative." House Report at 19, 1970 U.S.C.C.A.N. at 3667. The statute specifically provides that the Rate Commission shall "promptly" consider a request from the Board of Governors, 39 U.S.C. § 3624(a), and that it is to conduct its proceedings with the "utmost expedition consistent with procedural fairness." *Id.* § 3624(b). The Commission generally must respond to a Board request on rates within ten months. *Id.* § 3624(c)(1).

The allowance under protest is one of two provisions specifically intended to ensure that delays or impasse in the ratemaking process not stem the flow of necessary revenues to the Postal Service. The other provision is § 3641, which provides for temporary rate increases in three cases of delay.[6] Timely rate increases were essential to Congress' design to make the Postal Service largely, if not entirely, self-sufficient; after a transition period, there would be no or virtually no federal subsidies to make up for revenue shortfalls or delays. *See* House Report at 17, 1970 U.S.C.C.A.N. at 3665; Conference Report at 7, 1970 U.S.C.C.A.N. at 3719. Financial self-sufficiency was a consistent guiding principle, both in the earlier reorganization proposals, which contemplated a government-owned postal corporation, and in the later proposals, which called for independent executive agencies. Then-Postmaster General Winton Blount testified at the Senate hearings on an earlier version of postal reform bill:

Mr. Chairman, the Kappel Commission [President's Commission on Postal Organization] expressed profound concern with the problem of regulatory delay. We share this concern. Accordingly, the bill provides a full range of procedures which the rate commissioners may adopt to expedite proceedings while, at the same time, insuring a full and fair hearing for all. If the rate commissioners are unable to complete their proceedings within [the statutory period], or if judicial proceedings are instituted to set aside a final decision of the Postal Service with respect to rates, a proposed change may be put into effect temporarily after [the required] notice. These temporary rate provisions are analogous to the suspension provisions contained in the statutes governing the major Federal regulatory agencies. Under such statutes, the effective date of a proposed rate filed by a regulatory company with the regulatory agency may be suspended for a relatively brief period. If the agency has not completed its investigation of the rate within the stipulated time, the regulated company may put the proposed rate into effect pending subsequent ap-

---

**6.** First, where the Postal Rate Commission fails to send a recommended decision on *rates* to the Board of Governors as required by the Act, generally within ten months, the Postal Service, upon ten days' notice, may place into effect temporary changes. 39 U.S.C. § 3641(a). The temporary rate may remain in effect as long as 150 days after the PRC transmits its recommended decision to the Board. *Id.* § 3641(d). Second, where the Postal Rate Commission fails to respond to a request for a recommended decision on *classifications* within 90 days, or fails to respond to a request for reconsideration within 30 days, the Postal Service may similarly place into effect temporary classification changes, but these will be effective no longer than thirty days after the PRC makes its recommendation. *Id.* § 3641(e). Third, where a court returns a matter to the Commission for further consideration, the Postal Service, with the consent of the Commission, may place into effect temporary rates or classifications. *Id.* § 3641(f).

proval or disapproval by the regulatory agency.

1 *Postal Modernization: Hearings Before the Senate Comm. on Post Office and Civil Service,* 91st Cong., 1st Sess. 507 (1969).

While Postmaster General Blount spoke specifically of the interim rate provisions, the allowance under protest option performs similar functions and provides similar guarantees of ongoing revenues. When the Postal Service exercises its statutory authority to seek judicial review of a Postal Rate Commission recommendation, it avoids crippling delays by permitting that recommended decision to take effect in the interim. Absent such an option, the Postal Service would face the Hobson's choice of capitulating to the PRC recommendation, and thereby abdicating its statutory authority to set rates, or resubmitting its request for possibly endless rounds of reconsideration by the PRC, and thereby delaying the flow of needed revenues to the Postal Service. The revenue implications are obvious in the case before us, as the Board of Governors estimates that its decision to allow the recommended decision under protest provides the Postal Service an additional $20 million a day in revenues. Motion of United States Postal Service for Leave to Appear as a Party on Its Own Behalf, at 6 n. 4.

Although the "allowance under protest" option applies as well to decisions resubmitted to the PRC for reconsideration, it loses much of its utility if it does not also include meaningful judicial review. In any event, it was the clear judgment of Congress to allow this option in both circumstances. The DOJ, however, asserts the right unilaterally to determine when—if ever—this option could be exercised. This reading of the statute would effectively permit the Department to veto judicial review of PRC/Postal Service disputes, a result wholly at odds with clearly expressed congressional intent. Further, in light of the Department's suggestion that judicial review at the Postal Board's instigation may *never* be appropriate, Letter from Stuart M. Gerson, Assistant Attorney General, to Mary S. Elcano, General Counsel of the Postal Service (October 27, 1992), the Department could completely and single-handedly obliterate this congressionally-authorized—and congressionally-intended—review proceeding.

The DOJ's reliance on §§ 516 and 519, which were not persuasive as a matter of statutory construction, are even less convincing when considered in light of Congress' unequivocal intent gleaned from the legislative history to free the Postal Service both from political control and from the operation of "laws which in most instances apply to Government agencies and functions." Respect for the language of the Postal Reorganization Act and its underlying purposes simply will not permit the conclusion that Congress intended simultaneously to give the Postal Service such broad and unfettered discretion and to condition its judicial review options on the Department of Justice's—or even the President's—approval.

Although we conclude that § 409(d) cannot be read to frustrate Congress' clear intent to give the Postal Service a meaningful option to allow under protest and seek judicial review, we do not conclude that this feature of the ratemaking scheme can be read to deprive § 409(d) of all content. Instead, there is a way to reconcile these two provisions. As a preliminary matter, § 409(d) still requires that the Postal Service first seek legal representation or consent to self-representation from the DOJ. But when this representation or consent is declined, the Postal Service is not barred from pursuing this statutorily authorized option on its own. We stress, however, that this does not make the request to the DOJ for representation or consent meaningless or merely *pro forma*. There is no indication that Congress intended to give the Department *no* role in this form of judicial review, only that it did not intend to make the allowance under protest option subject to the Department's effective revocation. The express requirements of § 409(d), along with respect for the Attorney General's responsibility for centralized litigation, still require that the Postal Service first attempt to work out a representa-

tion agreement with the Attorney General. Given the general success that the Postal Service and the DOJ have had in coordinating Postal Service litigation, we expect that disagreements such as the one before us today will continue to be the exception.

## C. *Relevant Case Law*

Although we have found no case addressing the precise question whether the Postal Reorganization Act permits the Postal Service to seek judicial review without the involvement or consent of the Attorney General or to appear with counsel in private party challenges to its orders when the DOJ takes a litigation position contrary to the Postal Service's, other precedent construing the PRA lends support to our conclusion. This conclusion is also consistent with case law construing the effect of other statutes on the Attorney General's conduct and supervision of litigation.

### 1. Postal Service Cases

The Second Circuit has endeavored, as we do here, to preserve all the Postal Service's congressionally authorized options. *Time, Inc. v. USPS*, 685 F.2d 760 (2d Cir. 1982), like the present case, involved the intricacies of the "allowance under protest" option. The Board had initially permitted certain changes in rates to take effect under protest while sending the recommendation back to the PRC for reconsideration. When the PRC substantially reaffirmed its first recommendation, the Board rejected it, but left intact the rates that had taken effect under protest. *Id.* at 763. When the PRC issued its third recommendation, the Board revised it under its modification powers. A private party challenging the rates claimed that, when the Board first allowed them to take effect under protest under § 3625(c), it thereby elected to give up its option to modify or reject them under § 3625(d). *Id.* at 765.

The Second Circuit disagreed, concluding that, when responding to further recom-

mendations of the PRC, the Board retains the "full panoply" of statutory options. *Id.* at 766. To hold otherwise, said the court, would be in "direct conflict with the purposes and policies" of the Act, which was intended to "create an independent agency 'with the unfettered authority and freedom it [had] been denied for years.'" *Id.* (quoting S. REP. No. 912, 91st Cong., 2d Sess. 2 (1970)). By including the allowance under protest option, said the court, Congress "clearly made every attempt possible to ensure that the Service's cash flow would not be disrupted to ensure the 'prompt, reliable, and efficient services to patrons.'" *Id.* at 767 (quoting 39 U.S.C. § 101(a)). The court accordingly declined to restrict the allowance under protest option, which it viewed as an element of a "carefully designed statutory framework," intended to "enable the [Postal] Service to realize additional revenues pending the Board's resolution of its differences with the PRC." *Id.* We are similarly reluctant to read the statute to eliminate an option—judicial review—provided by this "carefully designed statutory framework."

The First Circuit, in a context much like the one before us, similarly concluded that congressional intent required preserving the Postal Service's litigation autonomy. In *Leonard v. USPS*, 489 F.2d 814 (1st Cir.1974), the Postal Service, over the objections of the Department, had settled an employment lawsuit with a disgruntled job applicant. *Id.* at 815. The Department appealed the trial judge's determination that 39 U.S.C. § 2008(c) [7] gave the Postal Service authority to settle litigation and claims without the Department's consent. Although the court expressly declined to decide whether the Postal Service may represent itself in court without the Attorney General's approval, *id.* at 816 n. 4, its reasoning is instructive here. It rejected

the view that 39 U.S.C. § 409(d) gives the Justice Department authority in all instances to control the conduct of litigation, including complete power over set-

---

**7.** 39 U.S.C. § 2008(c) provides: "Subject only to the provisions of this chapter, the Postal Service is authorized to make such expenditures and to enter into such contracts, agreements, and ar-

rangements, upon such terms and conditions and in such manner as it deems necessary, including the final settlement of all claims and litigation by or against the Postal Service."

tlement terms. The "shall furnish" language and the fact that this section is subject to the provisions of § 411, which speaks of "cooperation," indicates to us that, at least under the circumstances presented here, § 409(d) does not give the Attorney General veto power over a settlement approved by the Service.

*Id.* at 817. The court further concluded that the control that the Department sought was incompatible with the independence of the Postal Service. "It was the intent of Congress to create an independent Postal Service. It would be anomalous to hold that decisions normally committed wholly to the independent discretion of the Service are made subject to Department of Justice veto power when incident to litigation." *Id.* at 817–18.

Finally, we look to our own court's previous resolution of a dispute between the Postal Service and the Postal Rate Commission. *Governors of USPS v. United States Postal Rate Comm'n,* 654 F.2d 108 (D.C.Cir.1981). This dispute arose as follows: The Postal Service asked the Commission to recommend a decision on a change in the classification schedule that would establish computer-generated mail as a subclass of first class mail. In response, the Commission recommended that the program be approved solely as an "experimental service." The Board of Governors rejected this recommended decision and sought the Rate Commission's reconsideration. *Id.* at 112. When the Commission's further recommendation adhered to its earlier position, the Governors allowed it to take effect under protest and sought judicial review. The Governors claimed that the Commission lacked statutory authority to impose a finite date on a program, and we agreed, referring to the balance of authority Congress established between the two entities:

> We think the history demonstrates the intention of Congress to vest in the Board of Governors exclusive authority to manage the Postal Service. As a "partner" of the Board the Postal Rate Commission was assigned the duty and authority to make recommendations with respect to rates and classifications.

There is no indication that Congress contemplated that either "partner" would trench on the functions and prerogatives of the other; on the contrary each was to recognize and be guided by its "constitutional and legal responsibilities." Congress did not intend that the Postal Rate Commission regulate the Postal Service: one partner does not regulate another, and authority to assist in ratemaking and classification does not include authority to interfere in management.

*Id.* at 114–15 (footnote omitted). Although the Postal Service's management authority is not directly at stake in the present case, we believe our decision should show similar respect to the congressionally-established and delicate balance between the two "partners." *See id.* at 116 (statute created a "carefully constructed system of checks and balances between governmental agencies"). An integral part of that balance is the Postal Service's judicial review option.

### 2. Case Law Construing Other Statutes

The Department of Justice relies primarily on two cases, *Federal Trade Commission v. Guignon,* 390 F.2d 323 (8th Cir. 1968), and *Interstate Commerce Commission v. Southern Ry. Co.,* 543 F.2d 534 (5th Cir.1976), to support its contention that the PRA cannot be construed to permit the Postal Service to seek judicial review without the Attorney General's involvement or consent under the present circumstances. These cases, however, are distinguishable in that, in each, the agency's own statute clearly provided that the litigation at issue could be initiated only at the instance of the Attorney General.

In *Guignon,* the Eighth Circuit held that the Federal Trade Commission Act did not grant the FTC authority to enforce its subpoenas in district court without the aid or consent of the Attorney General. Although the Act gave the Commission the power to issue subpoenas and to invoke the aid of federal courts, it also expressly provided that the district courts would have jurisdiction to order compliance with the Commission's orders only *"[u]pon the application of the Attorney General of the*

*United States, at the request of the Commission." Id.* (emphasis added). The Act's legislative history directly underscored Congress' intent that the Attorney General alone could seek judicial enforcement of an FTC subpoena. *See id.* at 326. By contrast, neither the PRA nor its legislative history provides such an express indication that Congress contemplated action only upon the initiative of the Attorney General. To the contrary, the language and history of the PRA belie such an intent.

*Interstate Commerce Commission v. Southern Ry. Co.,* 543 F.2d 534 (5th Cir. 1976), is similarly distinguishable. The Fifth Circuit's conclusion that only the Attorney General could bring enforcement actions on behalf of the ICC was based largely on the explicit language of the statute, which provided that "[a]ll actions ... *shall be brought* by or against the United States," 28 U.S.C. § 2322 (emphasis added), and that the Attorney General *"shall represent* the Government in the actions specified...." *Id.* §§ 2322, 2323 (emphasis added). Moreover, the court found that the legislative history of the statute supported the view that only the Attorney General could initiate actions.[8] Finally, prior to the enactment of the new statute, the ICC was authorized to apply "in its own name" to a court for enforcement of its orders. 543 F.2d at 536 (citing Act of June 29, 1906, ch. 3591, § 5, 35 Stat. 591). The deletion of this provision "removed any doubt" about the ICC's authority to initiate enforcement proceedings. *Id.* at 537. The case before us differs in several significant ways: instead of providing that the Department of Justice "shall bring" an action, the PRA provides only that it "shall furnish" such legal representation as the Postal Service

may require; the statute incorporates certain provisions of title 28, yet excludes those concerning the Attorney General's conduct and supervision of litigation; and the legislative history points unmistakably toward Postal Service independence and initiative.

The present case is also distinguishable from *Guignon* and *Southern Railway* in that it involves judicial review, rather than enforcement. The Supreme Court has recognized the importance of the Attorney General's review and approval of agency enforcement actions:

> It was intended by Congress in providing this method of enforcing the orders of the Federal Trade Commission to impose upon the Attorney General the duty of examining the scope and propriety of the orders, and of sifting out of the mass of inquiries what in his judgment was pertinent and lawful.... The wide scope and variety of the questions, answers to which are asked in these orders, show the wisdom of requiring the chief law officer of the government to exercise a sound discretion in designating inquiries to enforce which he shall feel justified in invoking the action of the court.

*FTC v. Claire Furnace Company,* 274 U.S. 160, 174, 47 S.Ct. 553, 556, 71 L.Ed. 978 (1927). *See also Guignon,* 390 F.2d at 326 (distinguishing between the FTC's authority to seek enforcement of its orders in district court and defending its orders in the courts of appeals). The Postal Reorganization Act, by contrast, requires the Board of Governors, not the Attorney General, to designate those PRC recommendations that justify review in court. "Normally, where the responsibility for rendering a decision is vested in a coordinate branch of Government, the duty of the

---

**8.** President Taft, for example, had stated that the legislation was designed to change the existing law, under which

> the ICC itself initiates and defends litigation in the courts for the enforcement, or in the defense, of its orders and decrees, and for this purpose, it employs attorneys who, while subject to the control of the Attorney General, act upon the initiative and under the instructions of the Commission.... In my opinion, all litigation affecting the Government should be

> under the direct control of the Department of Justice; and I therefor recommend that all proceedings affecting orders and decrees of the Interstate Commerce Commission be brought by or against the United States *eo nomine,* and be placed in charge of an Assistant Attorney General acting under the direction of the Attorney General.

543 F.2d at 537 n. 2 (quoting H. Rep. No. 923, 61st Cong., 2d Sess. 3 (1910)).

**526**

Department of Justice is to implement that decision and not to repudiate it." *S & E Contractors, Inc. v. United States*, 406 U.S. 1, 13, 92 S.Ct. 1411, 1418, 31 L.Ed.2d 658 (1972).

Finally, this is not a case involving a "repeal by implication" of the statutory authority of the Attorney General. In the leading case of *United States v. Morgan*, 222 U.S. 274, 32 S.Ct. 81, 56 L.Ed. 198 (1911), the Supreme Court considered a food and drug statute that compelled a district attorney to prosecute certain cases when the Secretary of Agriculture presented satisfactory evidence of a violation. *Id.* at 280, 32 S.Ct. at 81. Defendants challenged their convictions on the ground that they had not been provided a preliminary hearing in the Department of Agriculture, as required by a separate section of the Act. The Court decided that any violations of the Act did not interfere with the district attorney's statutory duty to prosecute "all delinquents for crimes and offenses" under the laws of the United States. *Id.* at 281, 32 S.Ct. at 82. The Court stated that "[r]epeals by implication [were] not favored," and that it would not "graft such an exception upon the criminal law" without "a clear and unambiguous expression of the legislative will." *Id.* at 281–82, 32 S.Ct. at 82. Courts have cited *Morgan* for the proposition that a court will not diminish the statutory authority of the Attorney General to control litigation without a "clear and unambiguous directive from Congress." *See, e.g., United States v. Hercules, Inc.*, 961 F.2d 796, 798 (8th Cir. 1992); *United States v. Orkin Exterminating Co., Inc.*, 688 F.Supp. 223, 224 (W.D.Va.1988).

*Morgan*, however, is clearly distinguishable from the present case. The *Morgan* Court asked only whether the statutory grant of responsibility to one federal actor, the Secretary of Agriculture, could, *without more*, be construed to repeal the independent statutory duty imposed on another, the district attorney. *See Orkin, supra*, at 226 (statute authorizing the Administrator of the Environmental Protection Agency to authorize state prosecutions of environmental law does not diminish the

Attorney General's statutory authority to bring criminal prosecutions of same law). Here, by contrast, the applicable statutes—the Postal Reorganization Act and the Hobbs Act—delineate the relative responsibilities of the Board of Governors and the Attorney General. Most significantly, the judicial review provisions of §§ 3625(c) and 3628 qualify the Attorney General's customary role in Postal Service litigation, as defined in § 409(d). Moreover, even the broader role contemplated in § 409(d)—the furnishing of or consent to legal representation—is more circumscribed than a directive that the Attorney General shall "conduct" or "supervise" agency litigation. *See* 28 U.S.C. §§ 516, 519. Clearly, the statute contemplated at least shared litigation responsibilities.

Granted, these responsibilities are not stated concisely in one provision, *cf. Guignon*, 390 F.2d at 325, but that is not fatal. Indicating these responsibilities by reference to or incorporation of other provisions or other statutes only adds a few steps to the analysis. It does not make Congress' intent ambiguous or unclear. The will of Congress can be apparent from the structure and purposes of a statute, as well as from a single provision.

Finally, unlike in *Morgan*, in which the defendants' construction of the statute would have stripped the district attorney of his statutory authority—and obligation—to prosecute certain violations of federal laws, we have not operated a wholesale repeal of the Attorney General's statutory role in Postal Service litigation. To the contrary, we have conscientiously endeavored to reconcile all the applicable statutes and to respect the Attorney General's statutory role in Postal Service litigation. Our narrow decision does not even reach the Attorney General's role in any Postal Service litigation other than judicial review of Postal Service orders under § 3628. Even in the context of judicial review, we preserve the Attorney General's initial responsibility to furnish the legal representation the Postal Service requires, whether in initiating review or in responding to a private party challenge. Finally, we leave un-

touched the Attorney General's statutory authority to represent the Government's interests in any judicial proceedings reviewing decisions of the Postal Service or the Postal Rate Commission.

## IV.  CONCLUSION

■ This dispute calls upon us to address the Postal Service's right to self-representation in two specific, narrow situations: First, in a private party challenge to a Postal Service order in which the Attorney General has taken a position fundamentally contrary to that of the Postal Service. In this situation, the Postal Service is entitled to appear as a party and to be represented by counsel. Second, where it sought the Attorney General's aid or consent before seeking judicial review of a PRC recommendation under the Postal Reorganization Act. In this situation, the Postal Service is entitled to seek such review without the consent of, and even over the opposition of, the Department of Justice.

■ We need not and do not "attempt a definitive interpretation of powers between the Postal Service and the Department of Justice under 28 U.S.C. §§ 516 and 519 and under 39 U.S.C. §§ 409 and 411, for all purposes." *Leonard v. USPS,* 489 F.2d 814, 817 (1st Cir.1974). Instead, we conclude that the Postal Reorganization Act does not permit the Department's categorical refusal to represent the Postal Service in such judicial review proceedings to de-

prive the Postal Service of its statutory right to seek that review.[9]

Although the judicial resolution of interagency disputes is a common phenomenon, disputes between the Postal Service and the Postal Rate Commission rarely reach the courts. In fact, the first Board rejection of a Postal Rate Commission recommendation occurred more than a decade after the Postal Reorganization Act put this mechanism in place. *See Time, Inc. v. USPS,* 685 F.2d 760, 763 (2d Cir.1982). We credit both agencies with this history of living up to the congressional expectation that they would "work in harmony." Senate Report at 14. As the Senate Committee expressed it:

The committee envisions the Commission to be an integral part of the postal service, to be a true partner of the Board of Governors in every aspect of postal operations. If a bureaucratic struggle between the Board and the Commissioners develops, then the whole theory of independent ratemaking judgments will have failed and the Congress will probably be called upon to revise the system. But if individuals appointed to the Board on the one hand, and the Commission on the other, recognize the constitutional and legal responsibilities of their position and work together to achieve a truly effective postal service, then the independence of the Commission will serve a vitally important function by permitting them to

9.  Through this refusal, the Department effectively substitutes its own review for judicial review of disputes between the PRC and the Postal Service. The basis for this refusal is revealed by the Department's suggested answer to a significant constitutional question: whether this interagency dispute satisfies the "case or controversy" requirement of Article III of the U.S. Constitution. U.S. CONST. art. III, § 2, cl. 1. *See* Letter from Stuart M. Gerson, Assistant Attorney General, to Mary S. Elcano, General Counsel of the Postal Service (October 27, 1992). The justiciability of such interagency disputes, however, is a complex and sometimes controversial question that frequently must be addressed by the courts. *See, e.g., United States v. ICC,* 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949); *United States v. Nixon,* 418 U.S. 683, 697, 94 S.Ct. 3090, 3102, 41 L.Ed.2d 1039 (1974); *see generally* Michael Herz, United States v.

United States: *When Can the Federal Government Sue Itself?,* 32 WM. & MARY L.REV. 893 (1990). The Department of Justice's recognized responsibility to represent "the common interests of the Government and therefore of all the people" before the courts, *United States v. Providence Journal Co.,* 485 U.S. 693, 706, 108 S.Ct. 1502, 1510, 99 L.Ed.2d 785 (1988), clearly entitles it not only to try to resolve these interagency disputes before they reach the court, but also to raise this justiciability question in litigation before the court. In this circumstance, however, where Congress has specifically authorized judicial review of such disputes, respect for the Department's role in litigation does not require that we permit it unilaterally to repeal that statutory authority based on a constitutional question that has not been—and under the Department's approach, cannot ever be—decided by an Article III court.

view the overall impact of postal costs with a degree of detachment....

Senate Report at 13. The infrequent disputes between the two agencies need not signal the failure of the system. When such disputes do arise, however, Congress has clearly expressed its will that the courts, and not the Department of Justice, resolve them.

*Motion granted in part.*